35 F.3d 388
 25 Envtl. L. Rep. 20,291
 NATIVE VILLAGE OF QUINHAGAK; Native Village of Goodnews
Bay; the Association of Village Council
Presidents; Louie Smith; Annie
Cleveland, Plaintiffs-Appellants,
v.
UNITED STATES of America; Manuel Lujan, Jr., in his
official capacity as Secretary of the United States Dept. of
the Interior; State of Alaska; Carl Rosier, in his
official capacity as the Commissioner of the Alaska Dept. of
Fish & Game, Defendants-Appellees.
 No. 93-35496.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 4, 1994.
Decided Sept. 1, 1994.
 
 John Starkey (argued) Ass'n of Village Council Presidents, Bethel, AK; Joseph D. Johnson (on the briefs) Alaska Legal Services Corp., Anchorage, AK, for the plaintiffs-appellants.
 Elizabeth Ann Peterson, U.S. Dept. of Justice, Washington, DC, for the federal defendants-appellees; Joanne M. Grace, Asst. Atty. Gen., Anchorage, AK, for the state defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before: PREGERSON, CANBY, and BOOCHEVER, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 The Native Villages of Quinhagak and Goodnews Bay and others appeal the district court's denial of their motion for a preliminary injunction in their action brought under Title VIII of the Alaska National Interest Lands Conservation Act, 16 U.S.C. Sec. 3117(a), challenging state regulations that prohibit subsistence rainbow trout fishing and federal regulations that exclude Alaska's navigable waters from the regulation of "public lands." We have jurisdiction under 28 U.S.C. Sec. 1292(a)(1). We reverse.
 
 BACKGROUND
 
 2
 Appellants Quinhagak Village, Goodnews Bay Village, the Association of Village Council Presidents, and certain village residents (collectively the "Villages") have lived for over 2,500 years within the boundaries of the Togiak National Wildlife Refuge in Alaska. The Villages are subsistence fishing villages--their residents are rural Alaskans who make subsistence use of rainbow trout and other fish harvested from the Kanektok, Arolik, and Goodnews Rivers. The Villages fish the entire rivers, but depend primarily upon the navigable portions to meet their subsistence needs. Rainbow trout, in particular, are an important food source, especially in the winter, because they retain their fat content and are easy to locate and catch unlike other less dependable food sources.
 
 
 3
 When Congress enacted the Alaska National Interest Lands Conservation Act ("ANILCA") in 1980, 16 U.S.C. Secs. 3111-3126 (Title VIII--Subsistence Management and Use), it declared a policy of protecting the opportunity for rural Alaskans to continue a subsistence way of life. "[Fifty] percent of the food for three-quarters of the Native families in Alaska's small and medium villages is acquired through subsistence uses, and 40 percent of such families spend an average of 6 to 7 months of the year in subsistence activities." H.R.Rep. No. 1045, 95th Cong., 2d Sess., at 181 (1978). Congress has recognized that "Alaska is unique in that, in most cases, no practical alternative means are available to replace the ... fish and wildlife which supply rural residents dependent on subsistence uses[.]" 16 U.S.C. Sec. 3111(2). Nevertheless, as Congress also has recognized, the subsistence way of life is under increasing attack.
 
 
 4
 [C]ontinuation of the opportunity for subsistence uses of resources ... in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management[.]
 
 
 5
 Id. Sec. 3111(3). Therefore, through ANILCA, Congress provided that the taking of fish and wildlife on public lands for nonwasteful subsistence uses takes priority over the taking of fish and wildlife for other purposes. Id. Sec. 3114.[1] See id. Sec. 3113 (subsistence uses means the customary and traditional uses by rural Alaskans); id. Sec. 3112(1) ("The utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands....") (Emphasis added.)
 
 
 6
 Until the Alaska Supreme Court's decision in McDowell v. State, 785 P.2d 1 (Alaska 1989), Alaska implemented the requirements of ANILCA with its state subsistence law, 1986 Alaska Sess. Laws 52. As required by ANILCA, the Alaska statute granted a preference to rural Alaska residents, such as the Villages, to take fish and game for nonwasteful subsistence purposes. See 16 U.S.C. Sec. 3115(d) (appropriate state laws supersede federal regulation). The McDowell court invalidated Alaska's statute. McDowell, 785 P.2d at 6 (holding that rural preference violates the equal access provisions of the Alaska Constitution: subsistence hunting and fishing must be made available to all Alaskans). The unenforceability of the state subsistence law caused Alaska to fall out of compliance with ANILCA's rural preference requirement.
 
 
 7
 Alaska's noncompliance with ANILCA made the federal government responsible, beginning in 1990, for implementing ANILCA as to "public lands." See 16 U.S.C. Sec. 3115(d). First by temporary regulations, 55 Fed.Reg. 27,114 (June 19, 1990) (effective July 1, 1990), and, then by permanent regulations, 57 Fed.Reg. 22,940 (May 29, 1992) (effective July 1, 1992) (codified at 50 C.F.R. Sec. 100.3(b)), the Secretary of the Interior (the "Secretary") has taken the position that navigable waters within the state of Alaska are not public lands for purposes of ANILCA, and that therefore the Federal Subsistence Board (the "Federal Board") lacks subsistence management jurisdiction over Alaska's navigable waters.
 
 
 8
 Until 1993, the Villages were subject to an absolute ban on taking rainbow trout for subsistence uses. Alaska Admin.Code tit. 5, Sec. 01.010(1) (prohibiting the subsistence harvest of rainbow trout); 57 Fed.Reg. 43,097 (Sept. 17, 1992) (prohibiting the taking of rainbow and steelhead trout except as provided elsewhere); see 58 Fed.Reg. 31,175 (June 1, 1993) (noting that prior federal regulations prohibited the subsistence taking of rainbow trout). Under these regulations, residents of the Villages could be prosecuted for subsistence rainbow trout fishing in the navigable waters of the Kanektok, Arolik, and Goodnews Rivers. Sport rainbow trout fishers are allowed in these rivers and all Alaska waters.
 
 
 9
 On January 21, 1993, the Villages filed an action for declaratory and injunctive relief in federal district court under 16 U.S.C. Sec. 3117(a),[2] alleging in part that their residents are entitled to a preference for the taking of rainbow trout for nonwasteful subsistence uses in the navigable waters of the Kuskokwim Bay drainage (including the Kanektok, Arolik, and Goodnews Rivers), and that the state has no subsistence management jurisdiction over these waters. The Villages specifically challenge the federal regulations that define public lands to exclude navigable waters. They contend that the ANILCA preference granted to rural residents for nonwasteful subsistence hunting and fishing on public lands, 16 U.S.C. Sec. 3114, should apply to Alaska's navigable waters in addition to the state's non-navigable waters. By refusing to authorize subsistence fishing in navigable waters, the federal regulations restrict subsistence uses, allegedly in violation of Title VIII of ANILCA.
 
 
 10
 On February 19, 1993, the Villages filed a motion for a preliminary injunction to restrain the state, during the pendency of the litigation, from enforcing the prohibition against harvesting rainbow trout for subsistence uses in the Kanektok, Arolik, and Goodnews Rivers, and to require the United States to provide a preference for subsistence fishing in these waters.
 
 
 11
 After the Villages filed their motion, but before the district court's decision, the Alaska Board of Fisheries (the "Alaska Board"), in late February 1993, repealed the 20-year ban on subsistence rainbow trout fishing in the Kuskokwim Bay drainage. In its place, the Alaska Board adopted regulations, effective May 15, 1993, that allow "incidental takings" of rainbow trout for subsistence purposes but still prohibit directed rainbow trout fisheries for subsistence purposes. Alaska Admin.Code tit. 5, Sec. 01.005 (as amended) (rainbow trout may be taken for subsistence purposes only in the manner authorized by other regulations); Alaska Admin.Code tit. 5, Sec. 01.260(e) (as amended) ("[r]ainbow trout taken incidentally, in other subsistence finfish net fisheries, and through the ice, are lawfully taken and may be retained for subsistence purposes"); Alaska Admin.Code tit. 5, Sec. 1.275 (time period when specified portions of the Kanektok, Arolik, and Goodnews Rivers are closed to subsistence taking of fish by gill nets). Under the new regulations, the Villages may keep the rainbow trout that they catch while fishing for char, whitefish, or graying, for example, but they may not fish to catch rainbow trout.
 
 
 12
 In April 1993, the Federal Board determined that rainbow trout are customarily and traditionally taken for subsistence uses in the waters surrounding the Villages. See 58 Fed.Reg. 31,254 (June 1, 1993). By new regulations, the Federal Board legalized subsistence rainbow trout fishing in remote, non-navigable headwaters of the Villages' river systems. 58 Fed.Reg. 31,292, Sec. ___.26(d)(4)(v) (June 1, 1993) (codified at 50 C.F.R. Sec. 100.26(d)(4)(v)) (authorizing the Villages' subsistence fishing year-round for rainbow trout in the non-navigable waters that are located on public lands and drain into Kuskokwim Bay, including the non-navigable portions of the Kanektok, Arolik, and Goodnews Rivers); 58 Fed.Reg. 31,254 (June 1, 1993) (specifying that the Villages may use gill nets (except between March 15 and June 15), rod and reel, or fish by jigging through the ice); 58 Fed.Reg. 31,175 (June 1, 1993) (effective between April 5, 1993 and June 30, 1993) (same).
 
 
 13
 The Federal Board did not assert jurisdiction to allow subsistence rainbow trout fishing in the navigable portions of these rivers, despite its finding that the Villages customarily and traditionally use these waters for subsistence rainbow trout fishing. Navigable waters remain available only for incidental subsistence fishing pursuant to state regulation.
 
 
 14
 The district court denied the Villages' motion for a preliminary injunction. The Villages appeal.ANALYSIS
 
 
 15
 I. Denial Of The Villages' Motion For A Preliminary Injunction
 
 
 16
 There are essentially two factors for a district court to consider before ruling on a motion for a preliminary injunction: "The likelihood of the plaintiff's success on the merits; and, the relative balance of potential hardships to the plaintiff, defendant, and public." State v. Native Village of Venetie, 856 F.2d 1384, 1389 (9th Cir.1988). Plaintiffs, such as the Villages, are entitled to a preliminary injunction if they show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping [sharply] in [their] favor." MAI Sys. Corp. v. Peak Computers, Inc., 991 F.2d 511, 516 (9th Cir.1993) (required degree of irreparable harm increases as the probability of success decreases), cert. dismissed, --- U.S. ----, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994); Native Village of Venetie, 856 F.2d at 1389.
 
 
 17
 When the district court denied the Villages' motion, it explained that the Villages' complaint raises a "serious question," although it was "not in a position to conclude" that the Villages were likely to prevail on the merits. In addition, the court stated that the Villages had not proved either that they would suffer irreparable harm in the absence of a preliminary injunction or that the balance of hardships "tip[ped] sharply" in their favor. We agree with the court that the Villages' claim raises a serious question. But, the court abused its discretion when it determined that the balance of hardships did not tip sharply in the Villages' favor.
 
 A. Existence of Serious Questions
 
 18
 The district court's ruling that the case presents serious questions was undoubtedly correct. Indeed, none of the parties has argued that the questions are not serious.
 
 
 19
 The major question is whether, for purposes of ANILCA, public lands include navigable waters. More accurately stated, the question is whether the Secretary's regulation interpreting ANILCA to exclude navigable waters from the definition of public lands is unreasonable. See 57 Fed.Reg. 22,941-42 (May 29, 1992) (effective July 1, 1992); Chugach Alaska Corp. v. Lujan, 915 F.2d 454, 457 (9th Cir.1990) (court must defer to a federal agency's reasonable interpretation of a statute).
 
 
 20
 The statute defines public lands as lands, waters and interests therein, situated in Alaska, the title to which is in the United States. See 16 U.S.C. Sec. 3102.[3] The Villages present a serious question whether the United States retains reserved water rights for the Togiak National Wildlife Refuge that constitute the necessary federal "interest" in the waters in dispute. See Pub.L. No. 96-487, Title III, Sec. 303(6)(B)(iii)-(iv), 94 Stat. 2392 (purposes of Togiak National Wildlife Refuge); S.Rep. No. 96-413, 96th Cong. 2nd Sess. 195, 1980 U.S.C.C.A.N. 5070, 5139 (legislative history); Cappaert v. United States, 426 U.S. 128, 139, 96 S.Ct. 2062, 2069-70, 48 L.Ed.2d 523 (1976) (government withdrawal of land for federal purpose includes implied reservation of water needed to accomplish that purpose); United States v. New Mexico, 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978) (water rights implied only "where water is necessary to fulfill the very purposes for which a federal reservation was created").
 
 
 21
 The Villages also present a serious question whether the navigational servitude held by the United States on navigable waters constitutes the necessary federal "interest" in the waters in question. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 549 n. 15, 107 S.Ct. 1396, 1406 n. 15, 94 L.Ed.2d 542 (1987); Boone v. United States, 944 F.2d 1489, 1494-95 & n. 9 (9th Cir.1991) (discussing unique nature of navigational servitude); 43 U.S.C. Sec. 1635(l )(1) (Alaska's lands are subject to federal easements). But see City of Angoon v. Hodel, 803 F.2d 1016, 1027 n. 6 (9th Cir.1986) (commenting that navigational servitude is not public land within meaning of ANILCA).
 
 
 22
 Although we affirm this finding of the district court on the record, two later developments illustrate the correctness of the ruling. In a case being jointly managed with this one, the district court entered a decision finding in favor of an Alaska Native asserting a claim similar to that of the Villages here; the decision relied on the navigational servitude of the United States. Katie John v. United States, No. CV-90-0484 consolidated with No. CV-92-0264, 1994 WL 487830 (D.Alaska Mar. 30, 1994). That decision has been appealed to this circuit. At oral argument in the present case, the United States advised us that it had changed its position in Katie John and on appeal was conceding that its reserved water rights sufficed as an "interest" in the waters for purposes of ANILCA.
 
 
 23
 We express no opinion on the merits of either theory advanced by the Villages in this case, or on the merits of the Katie John decision or the government's position on appeal of that decision. It is clear, however, that the issues presented are serious questions, and we need say no more.
 
 B. The Balance of Hardships
 
 24
 Because serious questions are presented, the Villages are entitled to a preliminary injunction if the balance of hardships tips sharply in their favor. MAI Sys. Corp., 991 F.2d at 516. We conclude that they do.
 
 
 25
 The district court recognized that subsistence fishing is an important part of rural lifestyles and that the Villages' situation epitomizes the tragic collision of Native American and modern cultures in Alaska. Nonetheless, the court decided that the hardships attendant to the dispute do not tip in favor of the Villages because the actual harm involved is the collision of cultures, not the Villages' lack of access to a traditional food source. We disagree.
 
 
 26
 The United States and Alaska presented no evidence that the issuance of a preliminary injunction will injure them during the pendency of this litigation. Counsel for Alaska conceded at oral argument that directed rainbow trout fishing would have no immediate adverse effect on the fish population. And, counsel for the United States complained only of a regulatory burden from the expansion of federal ANILCA jurisdiction, even though a preliminary injunction might require only minor regulatory changes, if any.
 
 
 27
 Against the governments' failure of proof, the Villages presented strong evidence that injury is likely. Their evidence showed that navigable waters are critical for subsistence rainbow trout fishing. Most subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where fisherman have access to less fish.[4] And, rainbow trout is a critical source of fresh fat and protein, especially during the winter when equivalent substitute food sources are not available. The Villages' evidence showed that 95% of Quinhagak residents, for example, rely heavily on fish for survival, and that rainbow trout and char are the only fish which can be caught to provide fresh food when salmon are not available. (8/28/92 Subsistence Rainbow Trout Field Work Meeting). Moose and caribou are not available substitutes: moose hunting is closed in most of the Villages' customary hunting grounds, and each of the Villages is entitled to take only a limited number of caribou each year. 57 Fed.Reg. 43,088 (Sept. 17, 1992). See 16 U.S.C. Sec. 3111(2) ("Alaska is unique in that, in most cases, no practical alternative means are available to replace the ... fish and wildlife which supply rural residents dependent on subsistence uses[.]").
 
 
 28
 The Villages also presented evidence that the federal and state regulations interfere with their way of life and cultural identity. They presented, for example, the affidavit of a Quinhagak resident, which included the following:
 
 
 29
 It may be hard for people who do not live our way to understand, but regulations like this one for rainbow trout attack the way we put food in our families' stomachs, and they also hurt our minds and our spirits. Maybe it is like if I tell another person that it is now illegal for them to eat chicken or to earn a living, especially if it is a job they really enjoy. Quinhagak people are just like other people. They want to obey the law and feel good about doing those things which are important to their way of life. They also must feed their families and live within their culture and traditions.
 
 
 30
 (Affidavit of Frank Fox). They needed to prove nothing more in light of the clear congressional directive to protect the cultural aspects of subsistence living. 16 U.S.C. Sec. 3111(1) ("[T]he continuation of the opportunity for subsistence uses by rural residents of Alaska ... is essential to Native physical, economic, traditional, and cultural existence...."). See United States v. Alexander, 938 F.2d 942, 945 (9th Cir.1991) ("Many Alaska natives who are not fully part of the modern economy rely on fishing for subsistence. If their right to fish is destroyed, so too is their traditional way of life.").[5]
 
 
 31
 Furthermore, we agree with the Villages that the 1993 regulatory changes did not eliminate, or even mitigate, the demonstrated harm to them from the repealed federal and state bans on subsistence rainbow trout fishing. Alaska allows only incidental takings by subsistence users.[6] As pointed out by the Villages, the "incidental taking" limitation effectively amounts to a ban on subsistence rainbow trout fishing. Even though the Villages' access to rainbow trout is nominally greater than it has been, the actual situation is identical because the most effective way for the Villages to catch rainbow trout is by targeting them directly, rather than by taking the incidental catch from other fishing. See Affidavit of Jessie Foster (rainbow trout is a directed fishery; residents rarely catch rainbow trout during salmon fishing, i.e., by "incidental takings," because salmon fishing requires different gear).
 
 
 32
 If the Villages' interpretation of ANILCA is correct, the new state regulations reinforce the state of Alaska's denigration of the importance of subsistence fisheries. See Kenaitze Indian Tribe v. Alaska, 860 F.2d 312, 318 (9th Cir.1988) (criticizing the state for "tak[ing] away what Congress has given" to rural Alaskans by interpreting ANILCA to "protect commercial and sport fishing interests"), cert. denied, 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). Arguably, by its narrow interpretation of public lands, the United States has allowed Alaska to continue a policy of promoting sport and commercial fishing at the expense of subsistence users, such as the Villages.
 
 
 33
 Based on this discussion, we disagree with the district court that the Villages failed to develop "any particularly strong public interest argument." All of the equities support the Villages' position. Congress repeatedly and explicitly expressed its interest in protecting all subsistence uses against unnecessary regulatory interference. No policy reasons support allowing the United States and Alaska to continue their potentially unlawful regulatory programs until trial.
 
 
 34
 We conclude, therefore, that the district court erred in determining that the Villages had not shown that the balance of hardships tip sharply in their favor. It was consequently an abuse of discretion for the district court to deny the preliminary injunction, and we reverse its decision.
 
 II. Attorney's Fees
 
 35
 The Villages are entitled to recover all of their attorney's fees (including fees related to their request for a preliminary injunction) based on 16 U.S.C. Sec. 3117(a) ("[P]ersons ... who are prevailing parties in an action filed pursuant to [Sec. 3117(a) ] shall be awarded their costs and attorney's fees.").
 
 
 36
 Because of the strong public interest in the effective implementation of the subsistence priority by both the State and the Federal government, local residents and other aggrieved persons and organizations who are prevailing parties in an action filed pursuant to section 807 [16 U.S.C. Sec. 3117] shall be awarded their full costs and reasonable attorney's fees. This provision is important to ensure that the residents of Native villages, many of which are among the poorest communities in the Nation, will be able to secure adequate representation.
 
 
 37
 126 Cong.Rec. S31109 (daily ed. Dec. 1, 1980).
 
 
 38
 REVERSED.
 
 
 
 [1]
 The ANILCA priority attaches to nonwasteful subsistence uses, meaning that subsistence uses can be restricted in some circumstances:
 Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:
 (1) customary and direct dependence upon the population as the mainstay of livelihood;
 (2) local residency; and
 (3) the availability of alternative resources.
 16 U.S.C. Sec. 3114.
 
 
 [2]
 Persons "aggrieved by a failure of the State or the Federal Government to provide for the [Sec. 3114] priority of subsistence uses ... [may file an action in district court] to require such actions be taken as are necessary to provide for the priority.... The court may grant preliminary injunctive relief in any civil action if the granting of such relief is appropriate under the facts upon which the action is based." 16 U.S.C. Sec. 3117(a)
 
 
 [3]
 As used in ANILCA,
 (1) The term "land" means lands, waters, and interests therein.
 (2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.
 (3) The term "public lands" means land situated in Alaska which ... are Federal lands....
 16 U.S.C. Sec. 3102(1)-(3).
 
 
 [4]
 Although navigability determinations have not yet been made on most of Alaska's waterways, it is likely that few waterways of significance to fisheries will be classified as non-navigable due to the expansive definition of navigable. See, e.g., Alaska v. Ahtna, Inc., 891 F.2d 1401, 1402-05 (9th Cir.1989) (holding that river with depths of 1 to 3 feet and usable by inflatable rafts and small motorboats was navigable), cert. denied, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990). See Appellants' ER 119 (Federal Board 12/18/91 meeting) (Though little is known about the navigability of waters, "[i]t is most likely that a substantial portion of the present use does occur in navigable waters which are under State jurisdiction."). As argued by the Villages, the non-navigable waters, being inaccessible by boat and located far from any of the Villages, cannot alone satisfy subsistence fishing needs
 
 
 [5]
 The court focused on the absence of a showing by the Villages that people are going hungry, and by doing so, accorded insufficient weight to the Villages' evidence of harm to their culture and way of life. We agree with the Villages that, rather than focusing on whether anybody currently is starving, the court should have focused on the evidence of the threatened loss of an important subsistence food source and destruction of their culture and way of life
 
 
 [6]
 The district court was influenced, in large part, by the recent regulatory changes. However, the court overstated the effect of the regulatory changes when it described them as allowing subsistence fisheries in both the non-navigable and navigable portions of the Kanektok, Arolik, and Goodnews Rivers. In fact, the regulatory changes, while allowing subsistence rainbow trout fishing in non-navigable waters, allow only incidental takings of rainbow trout in navigable waters
 Nowhere does the statute authorize directed rainbow trout fisheries for subsistence purposes. See Appellants' ER 140 (The incidental taking provision "is in no way indicative of the board sanctioning a directed rainbow trout fishery for subsistence. And we realize that the populations there are stable, but yet they are not sufficient to warrant a directed subsistence fishery."). The Alaska Board does not have the information to do a customary and traditional use finding for rainbow trout, but is leaving open the possibility of future regulatory changes. Id.