ALASKA WILDERNESS RECREATION AND TOURISM ASSOCIATION; Organized Village of Kake; Southeast Alaska Conservation Council; Natural Resources Defense Council; The Wilderness Society, Plaintiffs–Appellants,

v.

Gary A. MORRISON, Forest Supervisor, Chatham Area, Tongass National Forest; Abigail Kimbell, Forest Supervisor, Stikine Area, Tongass National Forest; U.S. Forest Service, Defendants–Appellees.

Alaska Forest Association, Defendant–Intervenor–Appellee.

No. 95–35222.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1995.

Decided July 24, 1995.

As Amended Sept. 28, 1995.

Thomas S. Waldo, Sierra Club Legal Defense Fund, Inc., Juneau, Alaska, for the plaintiffs-appellants.

David Shilton, United States Department of Justice, Washington, DC, for the defendants-appellees.

James F. Clark, Robertson, Monagle & Eastaugh, Juneau, Alaska, for defendant-intervenor-appellee Alaska Forest Association.

Before: BROWNING, WRIGHT, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

The Alaska Wilderness Recreation and Tourism Association, the Organized Village of Kake, the Southeast Alaska Conservation Council, the Natural Resources Defense Council, and the Wilderness Society ("Alaska Wilderness") appeal the district court's denial of their request for an injunction and declaratory judgment against the United States Forest Service. *Amici curiae* Sitka Tribe of Alaska and Klawock Cooperative Association submit a brief in support of Alaska Wilderness. Intervenor Alaska Forest Association ("AFA") intervened on the side of the Forest Service.

Following the early termination of a 50-year contract with the Alaska Pulp Corporation ("APC"), the Forest Service opened the harvest area to bids from other lumber companies. We hold that the Forest Service's failure to hold public proceedings and to consider alternative plans for the area before embarking on new timber sales violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., and the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3101 et seq. We vacate and remand to the district court to conduct a balancing of the equities to determine whether the preliminary injunction now in force should continue pending the Forest Service's compliance with NEPA and ANILCA, or to fashion an injunction as it deems appropriate.

## I

### Statutory Framework

#### A. The National Environmental Policy Act

NEPA requires federal agencies to file an environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS is to include:

a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* The regulations of the Council on Environmental Quality ("CEQ") require the agency to prepare a supplemental EIS whenever "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" arise. 40 C.F.R. § 1502.9(c)(1)(ii).

B. Alaska National Interest Lands Conservation Act

According to ANILCA's policy statement, public lands in Alaska are to be used so as to "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands." 16 U.S.C. § 3112(1). Passed in 1980, ANILCA provides that in "determining whether to withdraw, reserve, lease or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions," the agency shall "evaluate the effect of such use," taking into account the "availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." 16 U.S.C. § 3120(a).

Where the use would "significantly restrict subsistence uses," the agency must also follow notice and hearing procedures and determine whether "such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of public lands." *See* 16 U.S.C. § 3120(a)(1)–(3).

In 1990, Congress enacted the Tongass Timber Reforms Act ("TTRA"), defined, *inter alia*, as an act to amend ANILCA, modify the existing 50–year timber contracts, and protect certain lands and riparian habitats in the Tongass National Forest. *See* Pub.L. No. 101–626, 104 Stat. 4426. TTRA section 101 amends ANILCA's mandate to supply 4.5 billion board feet of timber from the Tongass National Forest. Rather than requiring the Forest Service to meet a fixed supply level, the statute now directs the Forest Service to "seek" to meet the annual market demand for timber, "[s]ubject to appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976," and "to the extent consistent with providing for the multiple use and sustained yield of all renewable forest resources." 16 U.S.C. § 539d(a). TTRA section 301(c)(2) placed a proportional harvest constraint on old-growth timber in the APC and KPC 50–year contracts. 104 Stat. 4430 (1990).

II

Facts & Procedural History

This dispute arises in the wake of the Forest Service's cancellation of its 50–year timber sales contract with APC. While federal law now prohibits timber sales contracts of over ten years' duration, 16 U.S.C. § 472a, the contract with APC was among several long-term contracts initiated in the 1950's, of which only one is still in effect. That contract, with Ketchikan Pulp Company ("KPC"), will expire in 2004. The APC contract, set to expire in 2011, was cancelled by the Forest Service in April 1994 after APC closed its pulp mill in Sitka, laying off 400 workers.

Following cancellation of the APC contract, the Forest Service decided to offer the uncut timber formerly reserved for APC for sale to KPC under its long-term contract and to other lumber companies (via competitive bids) on an independent sales basis. Under the latter plan, the Forest Service would periodically offer for sale a specified number of board feet of timber. (The sale schedule made 71 million board feet ("MMBF") avail-

able for sale in July 1994, and projected sales of 100 MMBF for 1995.) One effect of the independent sales plan is the elimination of TTRA's proportional harvest constraint on old-growth timber.

### A. Environmental Evaluation Requirements

The current dispute centers on whether the Forest Service is required under NEPA or ANILCA to conduct formal environmental review, including production of an environmental impact statement ("EIS"), before proceeding with the proposed timber sales. The Forest Service produced several area EISs in 1992–93, prior to the cancellation of the APC contract. Their adequacy in light of that cancellation is the subject of this review. The Forest Service's environmental evaluation and management process may be summarized as follows.

#### 1. The Forest Plan

The Forest Service manages national forest land under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 et seq. In keeping with NFMA, the Forest Service articulates general goals through a Forest Plan,[1] which is to be revised every ten to fifteen years. The Forest Plan is implemented through site-specific plans subject to review under NEPA and in Alaska, ANILCA, which mandate the production of certain evaluative documents (most importantly, EISs, and supplementary EISs ("SEISs")). The current Forest Plan for the Tongass was issued in 1979, and amended in 1985–86. The Forest Service is currently working on a revised Tongass Forest Plan.

The 1979 Plan divides the Tongass into four land use designations ("LUDs"): I) wilderness lands; II) lands managed in a roadless state; III) lands managed for multiple uses, including timber; and IV) lands for resource development. The lands at issue here are LUD Types III and IV. While the Forest Plan thus anticipates timber harvest in these areas, timber sales cannot be carried out until site-specific plan requirements are met.

#### 2. The EISs

In 1992–93, the Forest Service produced its most recent site-specific EISs for the areas in question: the Kelp Bay EIS, the Southeast Chicagof EIS and the North & East Kuiu EIS. The three EISs evaluated the environmental and cumulative impacts of various alternatives within the parameters of the APC contract requirements. The EISs also considered the no-action alternative as required by NEPA, though they rejected it because it did not meet the APC contract requirements. While Alaska Wilderness does not challenge any of the existing EISs, it argues that the contract significantly restricted the Forest Service's consideration of alternatives. The Forest Service argues that the contract was not a limiting factor, but was itself a reflection of the underlying goals of the Forest Plan.

#### 3. Supplemental Evaluations

In July 1994, the Forest Service prepared brief supplemental evaluations ("SEs") for each of the three EISs. The SEs, which are identical except for area names, concluded that because Forest Plan direction and need for timber and timber-related jobs had not changed, termination of the APC contract was not a significant change requiring new or supplementary EISs or ANILCA evaluations.

### B. Procedural History

Alaska Wilderness filed suit in the district court in November 1994 to enjoin harvest of the timber formerly offered to APC. On February 27, 1995, the district court entered judgment for the Forest Service, and denied Alaska Wilderness's request for an injunction pending appeal. On March 23, 1995, we granted an emergency motion for an injunction pending appeal, and ordered expedited briefing. On April 25, 1995, we denied the Forest Service and AFA's emergency motion for modification of the preliminary injunction.

---

1. The Forest Plan is designated "TLMP" (for Tongass Land Management Plan) by appellant, and "LRMP" (for Land and Resource Management Plan) by appellee. We will refer to it as the Forest Plan.

## III

### NEPA and ANILCA Violations

#### A. Standard of Review

We review *de novo* legal premises upon which the district court based its decision. *City of Tenakee Springs v. Block,* 778 F.2d 1402, 1404 (9th Cir.1985). "This court will reverse the district court's denial of the preliminary injunction if we find that the district court relied on an erroneous legal premise in applying the appropriate legal standard." *Id.*

The parties dispute whether the district court applied the correct standard of review in analyzing the agency's decision. The district court expressly followed *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989), which held that where a court is asked to review a factual dispute implicating "substantial agency expertise" of a technical nature, the court's determination "is controlled by the 'arbitrary and capricious' standard of [5 U.S.C.] § 706(2)(A)."

The *Marsh* Court limited its holding to the "narrow question before [it]," which turned:

not ... on the meaning of the term 'significant' or on an application of this legal standard to settled facts [as respondents had argued]. Rather, resolution of this dispute involves primarily issues of fact. Because analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.

*Id.* at 377, 109 S.Ct. at 1861 (quotations and footnotes omitted). (The dispute concerned the Army Corps of Engineers' decision to construct a dam without preparing an SEIS to account for two new environmental studies. *See id.* at 363, 109 S.Ct. at 1853.)

We affirmed in *Greenpeace Action v. Franklin* that questions involving "resolution of factual disputes between the [agency's] scientific conclusions and those of [petitioner's] experts," fall within the reasoning of *Marsh* and are subject to the arbitrary and capricious standard of review. 14 F.3d 1324, 1331 (9th Cir.1992) (as amended). We further clarified that there is no good reason to distinguish between decisions regarding preparation of an initial EIS and preparation of a supplemental EIS. *Id.* at 1330. We observed, however, that "*Marsh* appears to distinguish cases which turn on 'the legal meaning of the term "significant" or ... the predominantly legal question whether established and uncontested historical facts presented by the administrative record satisfy this standard,' " *id.* at n. 6 (quoting *Marsh,* 490 U.S. at 376, 109 S.Ct. at 1860). Because the issue before us in *Greenpeace* was clearly factual in nature, we expressed "no opinion as to the standard by which to review [legal] challenges." *Id.*

Challenges to agency actions which raise predominantly legal, rather than technical questions, are rare. The issue before us, however, is just such a challenge, and we therefore must address the question of what standard of review is appropriate in such a case. The Forest Service's decision not to proceed with an SEIS did not, as it maintains, reflect an assessment of the effects of the APC contract termination on the environment. Rather, the decision involved an assessment of the effects of the termination of the contract on the EIS process.

■ We find that it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominantly legal questions. Because we find that the issue before us— whether cancellation of the APC contract was a circumstance requiring public proceedings and supplemental EISs under NEPA and ANILCA—is predominantly a legal rather than a factual one, we hold that the applicable standard of review in this case is reasonableness.

#### B. Discussion

■ The Forest Service cites several cases to the effect that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh,* 490 U.S. at 373, 109 S.Ct. at 1859; *See also Wisconsin v. Weinberger,* 745 F.2d 412, 419 n. 6 (7th Cir.1984) ("[I]t would be unreasonable to require the agency to reas-

sess its decision every time ... new forecasts were released, for it could 'risk immobilizing the agency.' "); *California v. Watt*, 683 F.2d 1253, 1268 (9th Cir.1982) (revised forecasts concerning number of oil reserves subject to development did not require SEIS), *rev'd on other grounds*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).

Alaska Wilderness argues that it is not challenging the Forest Service's evaluation of new substantive information, but rather its failure to reassess management alternatives in light of the fact that one of the primary goals of the last set of EISs—meeting APC contract volume requirements—has disappeared. As a result of the cancellation of the contract, the Forest Service is no longer constrained by its volume requirements. The 1992–93 EISs resolved the conflict subject to the APC contract requirement; in the absence of the contract, the Forest Service may—Alaska Wilderness argues it must— expand its range of alternatives.

The district court agreed with the Forest Service's interpretation of the issues. Because it found plausible the Forest Service's contentions that 1) the land in question was designated for timber use, 2) the APC contract was merely a vehicle for the sale of timber anticipated by the Forest Plan, and 3) market demand for timber has not changed as a result of the cancellation of the contract, the district court held that the Forest Service's decision to proceed with the sales without preparing a SEIS or conducting further ANILCA proceedings was not arbitrary or capricious. We discuss each of these contentions in turn.

### 1. *Land designation.*

The parties agree that the areas in question here are among those designated LUD III (multiple use, including timber harvesting) and IV (primary emphasis on resource use and development) in the Forest Plan.

These designations do not, however, indicate the proportion of timber harvesting to be carried out in the area relative to other stated management goals. And, as the Forest Service explains, the land designations established in the Forest Plan are broad land-use allocations subject to the site-specific determinations made through the EIS process, in compliance with NEPA and ANILCA.

Thus while timber harvesting is authorized in LUDs III and IV, actual sales of uncut timber are subject to EIS specifications, following a public hearing and based on an analysis which takes into account, *inter alia*, other authorized uses for these LUDs, including subsistence and recreation, and relevant statutory restrictions. As the Forest Service noted in the Kelp Bay EIS, "the TLMP [is a] 'permissive' plan, meaning it would allow harvest up to the maximum output goals but would not 'mandate' outputs at those levels, unless justified by a site-specific analysis." *See* Kelp Bay EIS, ch. 2, at 8 (Feb. 1992). *See also Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir.1994) (explaining that the timber harvest level in the Forest Plan indicates the maximum possible harvest; actual harvest is determined on the basis of site-specific analyses).

### 2. *The APC contract as Forest Plan vehicle.*

Alaska Wilderness does not challenge the propriety of the EISs drawn up in 1992–93. Rather, it argues that the EISs are no longer valid because the conditions under which they were devised have changed due to the unexpected cancellation of the APC contract. As the district court observed, the parties agree that the cancellation of the contract "was a new circumstance in the context of the EISs." However, the parties debate the "significance" of the new circumstance. As indicated above, an environmental agency is required to prepare an SEIS whenever "significant[2] new circumstances or information

---

**2.** CEQ regulations offer the following guidelines to define "significance":

"Significantly" as used in NEPA requires considerations of both context and intensity:
(a) *Context.* This means that the significance of an action must be analyzed in several contexts, such as society as a whole

(human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action....
(b) *Intensity.* This refers to the severity of impact.... The following should be considered in evaluation of intensity:

relevant to environmental concerns and bearing on the proposed action or its impacts" arise. 40 C.F.R. § 1502.9(c)(1)(ii).

The Forest Service argues, and the district court found, that the new circumstance created by the cancellation of the APC contract is not "significant" because the contract was, in the district court's words, "but a means to an end—supporting a timber harvest in the Forest consistent with the objectives of the TLMP." According to this view, the newly offered timber sales simply change the original parties to the contract, leaving everything else in place. But this conclusion assumes that the contract was made pursuant to the Forest Plan, and not vice versa. In fact, however, both the Forest Plan and the EISs were devised around the long-term contract, which the Forest Service took as a given.

Review of the EIS documents in the record reveals the degree to which the EISs were contract-driven. In accordance with NEPA, each EIS considers in some depth the area's character, the environmental impact of the proposed action, and a number of alternatives to the proposed action. As the CEQ advises, consideration of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. The CEQ directs that the section of the EIS devoted to alternatives shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and ... discuss the reasons [why other alternatives have been eliminated from detailed study].

(b) Devote substantial treatment to each alternative considered in detail....

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists....

(f) Include appropriate mitigation measures....

*Id.*

"The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Resources Ltd.*, 35 F.3d at 1307 (quotations omitted). "[A]n agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir.1992) (internal citation and quotations omitted). The "no action" alternative must also be considered in detail:

The goal of the statute is to ensure that federal agencies infuse in project planning a thorough consideration of environmental values. The consideration of alternatives requirement furthers that goal by guaranteeing that agency decisionmakers have before them and take into proper account all possible approaches to a particular project (*including total abandonment of the project*) which would alter the environmental impact and the cost-benefit balance.... Informed and meaningful consideration of alternatives—including the no action alternative—is ... an integral part of the statutory scheme.

*Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir.1988) (internal citations, quotations and alterations omitted), *cert. denied*, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989).

Each 1992–93 Tongass Forest EIS explains that the alternatives considered for detailed study were those which met the requirements of the APC contract. Thus, in the Kelp Bay EIS, "six alternatives *for making timber available to the APC* in the Kelp

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wet-

lands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial....
(10) Whether the action threatens a violation of Federal, State or local law....
40 C.F.R. § 1508.27.

Bay Project Area under the requirements of the TLMP were considered in detail." 1992 Kelp Bay EIS, ch. 2, at 10 (emphasis added). One of these was the "no action" alternative, which "serves as the benchmark by which effects of all action alternatives are measured." Id. The Forest Service found the no action alternative was not viable because it would not meet minimum APC contract volume requirements.

As the Southeast Chicagof EIS explained, areas outside the contract boundary were not considered in detail. "Providing Less Than The Contract Volume Was Not Considered In Detail" because there was insufficient projected volume from other sources to meet APC volume requirements, and because "[t]he Forest Service can expect a large monetary claim from APC [if it does not meet] contract volume obligations, for which there is no current funding." 1992 Southeast Chicagof Final EIS, App. A, at 4.

The Records of Decision ("RODs") similarly reflect the central importance of meeting the APC contract requirements. The Kelp Bay Regional Forester explained his decision as follows: "I have considered the need to help maintain a current timber supply to APC (as required by the long-term timber sale contract) in support of community stability, as well as the need to [protect] fish, wildlife, and other resources important to subsistence, recreation, commercial and other uses." 1992 Kelp Bay ROD at 2. The Kelp Bay and Southeast Chicagof RODs concluded that "[t]here is no alternative that would meet APC contract timber volume requirements and TLMP direction and yet avoid a significant possibility of subsistence restriction somewhere in the Forest." Id. at 14; 1992 Southeast Chicagof ROD at 26.

The Forest Service responds that the APC contract was not the "sole engine which drove the determinations in the EISs and RODs," though later in its brief it concedes, "the EISs may have focused primarily on the contract requirements." Our review of the EISs leads us to conclude that the Forest Service took into account other needs and uses only to the extent that they permitted contract requirements to be met. Without the APC contract, the Forest Service would undoubtedly still have allocated resources to timber harvesting in keeping with the Forest Plan, but it is impossible to tell how these allocations might have differed from the chosen plan, or to what extent other alternatives, eliminated from the EISs because they did not meet volume requirements, might have been considered in detail.

While we cannot predict what impact the elimination of the APC contract will have on the Forest Service's ultimate land use decisions, clearly it affects the range of alternatives to be considered. Because consideration of alternatives is "the heart of the environmental impact statement," 40 C.F.R. § 1502.14, we hold that the cancellation of the APC contract, which opened for consideration alternatives which could not be freely reviewed when the APC contract was in force, is an event requiring serious and detailed evaluation by the Forest Service.

### 3. *Unchanged market demand and impact of TTRA.*

The district court remarked that "[p]laintiffs ... got off the train at the wrong station by assuming that the issue is whether seeking to meet market demand in association with the permanent objectives of the TLMP required a new EIS or further ANILCA proceedings." Implicit in this remark is the district court's interpretation of TTRA's provision that the Forest Service shall "seek" to meet market demand for timber. The district court stated that TTRA § 101 is "mandatory," rather than "hortatory." In other words, the Forest Service *must* "seek to meet" market demand.

The wording of the statute is awkward, but, as noted, *see* Statutory Framework, *supra*, TTRA was written to amend ANILCA by eliminating its timber supply mandate and instructing the Forest Service instead to "seek to provide a supply of timber from the Tongass National Forest which (1) meets the annual market demand for timber from such forest and (2) meets the market demand from such forest for each planning cycle," "[s]ubject to appropriations, other applicable law, and the requirements of the National Forest Management Act of 1976," and "to the extent consistent with providing for the mul-

tiple use and sustained yield of all renewable forest resources." 16 U.S.C. § 539d(a). The revision clearly gives the Forest Service more flexibility than it had under ANILCA, when it was required to harvest a minimum number of board feet. TTRA envisions not an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation. It thus gives the Forest Service leeway to choose among various site-specific plans, provided it follows the procedural requirements of the applicable statutes.

The Forest Service suggests that the protections instituted by TTRA, including expansion of wilderness areas, lessen the necessity of considering other uses in the non-wilderness areas, or conversely, increase the necessity of harvesting timber in those areas to meet the goals of the Forest Plan. The Forest Service argues that Alaska Wilderness ignores the fact that the balance "between recreational and commodity uses ... is largely set in the Forest Plan (TLMP) rather than in the site-specific EISs."

We do not read TTRA to relieve the Forest Service of compliance with ANILCA or NEPA, however. As the majority noted in *City of Tenakee Springs v. Franzel*, TTRA was enacted to replace the "contract driven planning process" with a methodology designed to ensure compliance "with all applicable environmental laws and standards." 960 F.2d 776, 779 (9th Cir.1992). "The Forest Service's management of this forest also remains subject to the requirements of NEPA, [ANILCA], and the other applicable environmental laws in effect prior to the enactment of the TTRA." *Id.*

Alaska Wilderness argues that because the Forest Plan predated ANILCA as well as TTRA, it does not account for subsistence needs; therefore, "the Service cannot rely on the Plan for its subsistence analysis." Alaska Wilderness and *amici* argue that the Forest Service's failure to prepare a new statement thus constitutes a violation of ANILCA § 801 as well as a violation of NEPA. Alaska Wilderness stresses that the two sets of statutes serve different purposes. As we have explained:

> Both NEPA and ANILCA require the Service to consider reasonable alternatives

to a proposed action.... [NEPA is] designed to insure careful study of the environmental impact of government action. The relevant provisions of ANILCA are intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence.

*City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1310 (9th Cir.1990). Subsistence needs are not limited to maintaining a sufficient food supply, but include customary and traditional practices which ANILCA was designed to protect. *See* 16 U.S.C. § 3113; *Native Village of Quinhagak v. United States,* 35 F.3d 388, 394 n. 5 (9th Cir.1994) (in assessing subsistence requirements, courts must focus not just on likelihood of hunger but on destruction of village culture and way of life).

Addressing ANILCA in the EIS-based RODs, the Forest Service found "[t]here [was] no alternative that would meet APC contract timber volume requirements and TLMP direction and yet avoid a significant possibility of subsistence restriction somewhere in the Forest." 1992 Kelp Bay ROD at 14; 1992 Southeast Chicagof ROD at 26. Alaska Wilderness argues that with APC volume requirements out of the way, there may be other ways to slice the pie in keeping with the general goals of the Forest Plan and the requirements of subsequent regulations.

Because elimination of the contract appears significantly to alter the range of viable alternatives available to the Forest Service in managing the areas in question, we hold that the Forest Service's decision not to reconsider land use alternatives in an EIS after providing public notice and conducting proceedings in keeping with the requirements of NEPA and ANILCA was not reasonable.

## IV

### Injunctive Relief

In *Amoco Production Co. v. Village of Gambell,* the Supreme Court reaffirmed the "fundamental principle that an injunction is an equitable remedy that does not issue as of course." 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987) (citing *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311,

102 S.Ct. 1798, 1802, 72 L.Ed.2d 91 (1982)). The Court summarized the bases for injunctive relief as "irreparable injury and inadequacy of legal remedies," and explained that:

> In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."

*Id.* In short, courts must consider the "balance of harms" before deciding whether to afford injunctive relief.

The parties and *amici* supply arguments, studies, and declarations in support of their positions. In brief, the Forest Service and AFA state that an injunction will "cripple" the timber industry and cost thousands of jobs. AFA argues there is no alternative supply of timber, and states that an injunction would set it back by about two years. AFA and the Forest Service claim that appellants will not suffer any hardships if timber harvesting continues.

Alaska Wilderness and *amici* list hardships to Native subsistence users, the tourism industry, commercial fishing, wildlife, and recreation. Appellants claim that any negative impact to the timber industry as a result of an injunction will be minor and short-lived. They point out that there is a substantial timber backlog. AFA claims, however, that the backlog is not ready for processing. Finally, Alaska Wilderness argues that AFA's job figures are incorrect and that economic growth in the region is not dependent on timber. It cites figures to show that the region's economy has continued to grow in spite of the flagging timber industry. AFA counters that the timber industry is suffering from supply and not demand problems and adds that jobs in the timber industry are better paid than in alternative industries (such as tourism).

We have held that,

[t]he standard to determine if an action will significantly affect the quality of the human environment is whether the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor. A determination that significant effects on the human environment will in fact occur is not essential. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared.

*Sierra Club v. United States Forest Service,* 843 F.2d 1190, 1193 (9th Cir.1988) (internal citations and quotations omitted).

▌ Alaska Wilderness appears to have met this burden; it has made a showing that "the proposed project *may* significantly degrade some human environmental factor." *Id.* at 1193. However, we agree with the Forest Service that "[q]uestions as to whether an injunction would be appropriate during the remand, and the scope of any such injunction, raise intensely factual issues, and for that reason should be decided in the first instance by the district court." We therefore extend the temporary injunction, vacate the district court's order denying an injunction and remand to the district court for a balancing of the equities to determine whether and in what form the injunction should continue pending the Forest Service's compliance with NEPA and ANILCA. On remand, the district court is authorized to amend, vacate or replace the injunction entered by this court as it determines necessary.

## V

▌ On July 27, 1995, three days after this opinion was filed, Congress enacted the Emergency Supplemental Appropriations for Additional Disaster Assistance for Anti–Terrorism Initiatives, Pub.L. 104–19, which includes a rider relevant to these proceedings. Section 503 of the Appropriations Bill provides:

> (a) As provided in subsection (b), an environmental impact statement prepared pursuant to the National Environmental Policy Act or a subsistence evaluation prepared pursuant to the Alaska National Interest Lands Conservation Act for a tim-

ber sale or offering to one party shall be deemed sufficient if the Forest Service sells the timber to an alternate buyer.

(b) The provision of this section shall apply to the timber specified in the Final Supplement to 1981–86 and 1986–90 Operating Period EIS ("1989 SEIS"), November 1989; in the North and East Kuiu Final Environmental Impact Statement, January 1993; in the Southeast Chicagof Project Area Final Environmental Impact Statement, September 1992; and in the Kelp Bay Environmental Impact Statement, February 1992, and supplemental evaluations related thereto.

Pub.L. 104–19, § 503 (1995). The Forest Service argues that § 503 "removes the basis" for our decision by materially changing the law underlying the dispute. We disagree.

The Forest Service has repeatedly argued that in offering sales to new buyers, it would be doing nothing more than substituting parties to the APC contract. In keeping with this view, the Forest Service has maintained that the cancellation of the APC contract has no independent environmental significance. The Forest Service's decision to reoffer the timber at the levels specified in the original contract does not, however, negate the environmental significance of the cancellation.

As we have explained above, the environmental significance of the APC contract termination is that the contract no longer dictates the level of harm that must be endured by subsistence users and by the environment. The Forest Service is no longer obligated to sell the APC timber to anyone. It *is* obligated to comply with NEPA and ANILCA by considering alternatives that it formerly could not consider, because of its contractual obligations, in its public decision-making process.

Section 503 reflects the Forest Service's mistaken view that the dispute involves the changing of parties to a contract. The EISs in question were not prepared in order to allow the APC contract to go into effect, as the legislation suggests, but were driven by a

pre-existing long-term contract which could not legally be executed today.[3] In other words, the EISs were not prepared "for a timber sale," as § 503 specifies, but crafted around a contract effected in advance of statutory requirements aimed at balancing competing claims, including those of the market, subsistence and recreation users, wildlife, and preservation.

Section 503's implicit reference to a pending case is "of no moment." *Apache Survival Coalition v. United States,* 21 F.3d 895, 901 (9th Cir.1994). Congress has the authority to change the underlying substantive law and affect the outcome of any case which has not completed its "journey through the appellate process." *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1571 (9th Cir.1993). The "journey" is not complete until "the availability of appeal is exhausted, and the time for a petition for certiorari has elapsed or a petition for certiorari finally has been denied." *Id.* (quotations and alterations omitted).

However, while Congress unquestionably may amend substantive law affecting a pending case, and may do so in an appropriations statute, *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 438, 112 S.Ct. 1407, 1415, 118 L.Ed.2d 73, 85 (1992), it has not done so here. Section 503 offers no new statutory basis on which to analyze the matter at issue here: the effect of the cancellation of a pre-existing timber sales contract on the EIS process. Consideration of alternatives is the "heart" of the public decision-making process which culminates in the EIS. 40 C.F.R. § 1502.14. There is not the slightest indication that Congress intended through § 503 to vitiate the EIS process by eliminating the consideration of alternatives requirements of NEPA and ANILCA.

For the reasons set out above, we hold that section 503 does not alter the legal basis for our decision.

**VACATED and REMANDED.**

---

**3.** As noted above, federal law prohibits timber sales contracts of over ten years' duration. 16 U.S.C. § 472a.