**Donald YOUNG, et al., Plaintiffs,**

**v.**

**GENERAL SERVICES
ADMINISTRATION,
et al., Defendants.**

**Civil Action No. 99–671–(EGS).**

United States District Court,
District of Columbia.

June 1, 2000.

Nicholas C. Yost, Gillian W. Thackray, Sonnenschein, Nath & Rosenthal, San Francisco, CA, Kirk R. Ruthenberg, Stuart E. Hunt, Drew W. Marrocco, Sonnenschein, Nath & Rosenthal, Washington, DC, for Plaintiffs.

Daria J. Zane, Assistant U.S. Attorney, Washington, DC, Gregory Andrew Castanias, Donald B. Ayer, Robin L. Juni, Jones, Day, Reavis & Pogue, Washington, DC, for Defendants.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

### INTRODUCTION

Plaintiffs Donald and Diane Young, James Burke, and Charles E. Smith Realty L.P. ("Smith Realty") [hereinafter "plaintiffs"] commenced this lawsuit to enjoin defendants General Services Administration ("GSA") and United States Patent and Trademark Office ("PTO") [hereinafter "the government"] from awarding a contract to defendant-intervenor LCOR Alexandria L.L.C. [hereinafter "LCOR"]

to develop the government's proposed project to consolidate PTO facilities in Alexandria, Virginia. Plaintiffs claim that the government has failed to comply with the National Environmental Policy Act ("NEPA") in its preparation of an Environmental Impact Statement ("EIS") by refusing to consider plaintiff Smith Realty's Alternative Scenario for the consolidation project and for allegedly failing to take the requisite "hard look" at various environmental impacts created by the project. The government counters that plaintiffs' proposal need not be considered because it would not result in the increased efficiency that is the project's purpose.

The Court consolidated plaintiffs' application for a preliminary injunction with a hearing on the merits pursuant to Fed. R.Civ.P. 65(a)(2). Pending before the Court are cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. The Court has considered the parties' motions, oppositions, replies, and counsels' oral arguments on August 20, 1999, as well as the applicable statutory and case law.

The Court finds that the case law supports the government's and intervenor's position with respect to Smith Realty's Alternative Scenario. The government need not consider the Alternative Scenario because it is not a reasonable alternative and will not bring about the government's desired objectives of efficiency. The Court also upholds the agency's modification of the "No Action" alternative to include the effects of reasonably foreseeable development. Finally, the Court concludes that the Final Environmental Impact Statement ("FEIS") submitted by the government has taken a sufficiently "hard look" at environmental impacts of the proposed project.

For those reasons, which are explained in greater detail in the body of the opinion, the Court **GRANTS** the motions of the federal defendant and intervenor-defen-

dant LCOR for summary judgment,[1] and **DENIES** plaintiffs' motion for summary judgment and a preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Parties*

Plaintiffs Donald P. Young, Diane G. Young, and James W. Burke are residents of the Carlyle Towers in Alexandria, Virginia, which is located across the street from the Carlyle site[2] that is proposed for the PTO Consolidation project. Plaintiff Smith Realty is the bidder whose Crystal City site was not selected for the PTO Consolidation project. Defendant PTO is an agency within the Department of Commerce that is responsible for issuing patents, registering trademarks, disseminating information, and administering the laws of the United States related to intellectual property. Defendant GSA is the federal agency with the statutory authority to obtain and assign office space to federal agencies. Intervenor-defendant LCOR is the bidder whose proposal was chosen for the PTO Consolidation project.

### II. *Events*

PTO is currently housed in eighteen separate buildings in the Crystal City area of Arlington, Virginia.[3] In July 1995, GSA and PTO sought Congressional approval for a long-term lease to consolidate PTO's facilities. GSA submitted a prospectus to Congress that called for a twenty-year lease of 2.168 million to 2.387 million square feet.[4] PTO initiated this project because "[m]any of [its] leased buildings are in need of alterations to meet fire, life safety, and handicapped accessibility guidelines. Mechanical and electrical upgrades are also needed for the agency's automation and organizational requirements." Final Fed.Defs.' Opp'n to Pls.' Mot. for Summ.J. at 4. In addition, PTO stated that "[s]ignificant growth in the number of patent and trademark applications filed has greatly increased PTO's workload.... Expansion space is required to house personnel, their files, and reference materials that support the patent and trademark application processes." *Id.* The Need and Purpose of the project was[5] summarized in the Draft Environmental Impact Statement ("DEIS"):

> The purpose of the proposed PTO consolidation is to provide a facility that can improve operational efficiency and better meet the needs of PTO's employees and customers.... Therefore, the proposed action includes expansion space to accommodate projected increases in patent and trademark filings, consolidation of PTO's space into no more than eight buildings to maximize and improve efficiency, and upgraded physical facilities that meet all current regulations and PTO's automation needs.

*Id.* (citing DEIS, Section 1.2).

On June 26, 1996, GSA issued Solicitation for Offers ("SFO") No. 96.004, seeking

---

1. Because the motion filed by LCOR is substantially similar to that of the federal defendant, the discussion in this opinion of the government's motion for summary judgment incorporates, by reference, the arguments of the intervenor-defendant.

2. The procurement process resulted in three final sites: (1) the Crystal City site, which would consist of six renovated existing office buildings and two new buildings, submitted by plaintiff Smith Realty; (2) the Carlyle site, which would consist of five office buildings and two parking garages in Alexandria, Virginia, submitted by defendant-intervenor LCOR; and (3) the Eisenhower site, which

would consist of six office buildings equally divided onto two campuses on either side of the Eisenhower Avenue Metrorail station in Alexandria, Virginia, submitted by the Hoffman group.

3. Sixteen of those buildings are owned or controlled by entities associated with Smith Realty, which currently receives over $4 million per month in rent for PTO's current space.

4. Adjusted for rounding.

5. *See* discussion of the Environmental Impact Statement, *infra*, p. 67–68.

competitive lease proposals for PTO's consolidated space needs. According to GSA, the SFO:

> represents a detailed description of PTO's minimum needs for its consolidated headquarters that, *for purposes of NEPA,* reflects the underlying purpose and need of the project. The SFO includes a number of detailed performance specifications ... [which] will specifically enhance the operational efficiency of PTO's headquarters space consistent with the general purpose and need of improving operational efficiency and consolidating operations set forth in the FEIS.

*Id.* at 4–5 (emphasis added). The PTO's minimum requirements for its headquarters included dedicated service elevators, multipurpose storage and receiving areas, a mailroom, a fitness facility, a health unit, a cafeteria, an auditorium, and other required meeting rooms. The SFO also contained specifications for structural live floor load, passenger elevator performance criteria, electrical requirements, communications rooms, and service elevators, and incorporated a provision for a fit-out allowance of $88 million. Offerors were required to provide for an interior build out in this amount as part of their offered rental rate.

On April 21, 1997, GSA issued a Notice in the Federal Register of its intent to prepare an EIS under NEPA related to the proposed lease consolidation of PTO. On June 4 and 5, 1997, GSA conducted two public "scoping" meetings prior to its preparation of a DEIS and considered the testimony presented at the hearings, as well as written comments submitted during the scoping process. GSA solicited this information in order to quantify the environmental impacts it should analyze in con-

nection with the consolidation project. Following the scoping process, GSA analyzed information relevant to the presence of hazardous substances at the offerors' sites.[6]

Plaintiff Smith Realty filed a bid protest concerning the SFO with the General Accounting Office on June 30, 1997. On August 8, GSA amended the SFO to provide, among other things, that environmental impacts and mitigation measures identified as part of the government's review of the proposed leasing action under NEPA[7] and an offeror's ability and willingness to resolve such impacts and implement such mitigation measures, would be considered as part of the Phase Two technical evaluation.[8] After the four remaining offerors, including Smith Realty, submitted their Phase Two proposals on October 27, 1997, the offeror of the Potomac Yards site withdrew from the procurement. Smith Realty submitted one proposal that purported to satisfy all SFO requirements and another "Alternative Scenario" that failed to satisfy all SFO requirements.

On April 3, 1998, GSA issued the DEIS for public comment and received comments from federal, state, regional, and local government agencies, the offerors, private organizations, and interested members of the public. On April 29 and 30, 1998, GSA received oral testimony on the DEIS. The government then made changes in response to the comments and, on October 9, 1998, GSA requested that the remaining three Phase Two Offerors submit their Best and Final Offers ("BAFOs") by November 16, 1998. At this time, GSA informed Smith Realty that a proposal would not be considered for award if it failed to satisfy the minimum requirements of the SFO.

---

6. Some of this information was submitted by the offerors in response to the SFO, and other information was independently developed by GSA and its contractors.

7. This fact contradicts plaintiffs' assertion that the government did not consider NEPA.

8. From March to November 1998, GSA conducted discussions with the Phase Two offerors and responded with amendments to the SFO where appropriate.

Smith Realty filed an Agency Protest with the GSA Contracting Officer on November 13, 1998, to complain about certain SFO requirements. Smith Realty and the remaining two offerors submitted their BAFOs three days later, and Smith Realty again submitted a proposal that purported to satisfy all SFO requirements in addition to its Alternative Scenario. On December 18, the Contracting Officer denied Smith Realty's Agency Protest, and on December 28, Smith Realty filed a complaint in the United States District Court for the Eastern District of Virginia related to the SFO and the procurement.[9] On January 22, 1999, Contracting Officer James Smale informed Smith Realty that its Alternative Scenario failed to meet the minimum requirements.

On January 22, 1999, GSA issued the FEIS, which consisted of two volumes. The first volume described any changes to GSA's analysis and characterization of environmental impacts, published comments that GSA received on the DEIS, and responded to the substantive comments; the second volume consisted of the DEIS. On January 27, GSA discussed the procurement with Smith Realty, as it did with all of the offerors.[10] At that time, Smith Realty informed GSA that it would submit another alternative offer despite GSA's admonitions. On April 29, 1999, GSA transmitted the Program of Requirements to all offerors and requested submission of BAFOs. On May 21, 1999, the offerors submitted BAFOs, and Smith Realty again submitted its Alternative Scenario as well as a proposal that purported to meet all SFO requirements. GSA issued its Record of Decision ("ROD") on June 14, 1999 and identified Intervenor LCOR's Carlyle proposal as the proposal representing the greatest overall value to the government, consistent with the evaluation criteria established in the SFO. GSA judged LCOR's

proposal to be the highest rated technically and the lowest priced.

### STANDARD OF REVIEW

I. *Summary Judgment*

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975).

The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment. Summary judgment is also appropriate where, as here, review is on the administrative record. *See, e.g., Richards v. INS*, 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977) ("Summary judgment is appropriate after a review of the administrative record."); *see also Lun Kwai Tsui v. Attorney General of the United States*, 445 F.Supp. 832, 835 (D.D.C.1978) (quoting *Richards* ).

II. *Administrative Procedure Act*

■ Under the Administrative Procedure Act ("APA"), a reviewing court shall "hold unlawful and set aside agency ac-

---

9. *See CESC Plaza Ltd. Partnership v. United States Dept. of Commerce Patent & Trademark Office*, Civ.A. No. 98–1837 (E.D.Va. July 29, 1999).

10. GSA received comments from the offerors and several government agencies, including the Environmental Protection Agency.

tion,[11] findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing whether agency action was arbitrary and capricious, the Court is deferential to the administrative agency, *see Environmental Defense Fund, Inc., v. Costle*, 657 F.2d 275, 282 (D.C.Cir.1981); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc), and presumes the agency action to be valid. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, the "arbitrary and capricious" standard is a narrow one, which forbids a court from substituting its judgment for that of the agency. *See id.* at 416, 91 S.Ct. 814; *see also Ethyl Corp.*, 541 F.2d at 34.

■ In applying the "arbitrary and capricious" standard, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), but a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). That standard directs this Court to determine "whether the decision was based on a consideration of the relevant factors and whether there was clear error of judgment." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C.Cir.1997) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856) (emphasis added). In making this determination, a Court reviews whether the agency action was arbitrary and capricious based upon the administrative record that was before the decisionmaker at the time the decision was made. *See Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814.

In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision "makes sense." Only by "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Dubois v. United States Dept. of Agriculture*, 102 F.3d 1273, 1285 (1st Cir.1996) (citations omitted).

## DISCUSSION

### I. Arguments of the Parties

Plaintiffs argue that the extremely restrictive requirements of the SFO narrowly limited the pool of reasonable alternatives to be considered under NEPA. *See* Pls.' Mem. of P. & A. in Supp. of Mot. for Summ.J. at 22. They assert that their Alternative Scenario meets the stated Need and Purpose of the PTO project and, thus, must be considered as a reasonable alternative under NEPA. Plaintiffs further argue that the government is attempting to contract away its responsibilities under NEPA and has stacked the deck against the reuse of existing buildings. *See id.* at 24.

The government counters that because the Competition in Contracting Act ("CICA") requires an agency to "evaluate sealed bids and competitive proposals based solely on the factors specified in the [SFO]," 41 U.S.C. § 253b(a), "a proposal that fails to meet the agency's minimum requirements as reflected in the [SFO] cannot be considered for an award." Fed. Defs.' Opp'n to Pls.' Mot. for Summ.J. at 9. The government also argues that plaintiffs seek to compel the government to consider an alternative proposal that clearly fails to meet the SFO's minimum requirements. The government contends that if it accepted plaintiffs' argument, the process would

---

**11.** Agency action is defined as "the whole or part of an agency rule, order, license, sanc-

tion, relief or the equivalent, or denial thereof, or failure to act." 5 U.S.C. § 551(13).

become a "sole source contract for existing space" and "would give an unfair competitive advantage to the use of existing buildings to the detriment of all other proposals for new construction." *Id.* The government argues that plaintiffs' proposed reconciliation of CICA and NEPA would render CICA a nullity, which is problematic given that the government has already incorporated its . NEPA responsibilities into the drafting of the SFO. *See* Fed. Defs.' Opp'n to Pls.' Mot. for Summ.J. at 9.

## II. *Statutory Scheme*

### A. *National Environmental Policy Act*

In 1969, Congress passed the National Environmental Policy Act ("NEPA"), codified at 42 U.S.C. § 4321 *et seq.*, to ensure that all federal agencies consider the environmental impacts of major federal actions that affect the "quality of the human environment." 42 U.S.C. § 4332(2)(C). One of the statute's primary purposes is to make certain that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *see also City of Grapevine, Texas v. Department of Transp.,* 17 F.3d 1502, 1503–04 (D.C.Cir. 1994) (discussing the agency's mandate to take a "hard look" at the environmental consequences of its decision to proceed with a project).

> The NEPA process involves an almost endless series of judgment calls.... It is ... always possible to explore a subject more deeply and to discuss it more thoroughly.... [The role of the courts in reviewing the judgment calls made by the agency] is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.

*Coalition of Sensible Transportation v. Dole,* 826 F.2d 60, 66 (D.C.Cir.1987) (internal quotations omitted).

In addition to providing crucial information to the agency, NEPA also "guarantees that the *relevant information* will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson,* 490 U.S. at 349, 109 S.Ct. 1835 (emphasis added). This larger audience includes the President, who is responsible for the agency's policy; Congress, which has authorized the agency's actions; and the public, which receives the "assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process,'" *Sierra Club v. Watkins,* 808 F.Supp. 852, 858 (D.D.C. 1991) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)), as well as the opportunity to comment. Thus, NEPA has " 'twin-aims': (1) to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action and (2) to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996).

NEPA sets forth procedural safeguards to effect this "hard look" and ensure proper consideration of environmental concerns; it does not, however, require particular substantive results. *See City of Carmel–by–the–Sea v. United States Dept. of Transp.,* 123 F.3d 1142, 1150 (9th Cir. 1997). The cornerstone of NEPA's procedural protections is the Environmental Impact Statement ("EIS"), a detailed statement that discusses:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects that cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C). Under this provision, a government agency must prepare an EIS whenever a proposed government action qualifies as a "major Federal action significantly affecting the quality of the human environment."

### B. *Standard of Review*

■ The agencies, themselves, have the primary responsibility to comply with NEPA. As long as an agency has taken a "hard look" at an action and has followed NEPA's procedures, a court will not overturn an agency's substantive decision unless it is arbitrary, capricious, or an abuse of discretion.[12] *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Supreme Court has emphasized that "once an agency has made a decision subject to [NEPA's] procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980); *see also Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 194 (D.C.Cir.1991) (quoting *Strycker's Bay* ). While this standard of review is highly deferential, it is not a rubber stamp. *See Dubois,* 102 F.3d at 1285. Under this standard, "a reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"

"This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851; *see also Sierra Club,* 808 F.Supp. at 859 (quoting *Marsh* ).

### III. *Consideration of Smith Realty's Alternative Scenario*

Plaintiffs' primary allegation is that the government violated NEPA by failing to consider Smith Realty's proposed Alternative Scenario. NEPA requires that an agency consider all reasonable alternatives:

[A]n agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality. Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish these goals and the project would collapse under the weigh of the possibilities.

*Citizens Against Burlington,* 938 F.2d at 196.

The government responds that its consideration of plaintiffs' Alternative Scenario is constrained by the Competition in Contracting Act ("CICA"), 41 U.S.C. §§ 253 et seq., which was enacted in 1984 to provide for full and open competition in the government's procurement of goods and services. *See Ameron, Inc. v. United States Army Corps of Engineers,* 787 F.2d 875, 879 (3d Cir.1986), cert. dismissed, 488 U.S. 918, 109 S.Ct. 297, 102 L.Ed.2d 264 (1988); *see also United States v. Instruments, S.A., Inc.,* 807 F.Supp. 811, 812 (1992) (citing *Ameron* ). The drafters of CICA sought "to establish a statutory preference for the use of competitive procedures in awarding federal contracts for property or services, to impose restrictions

---

**12.** Because NEPA does not set forth a standard of review, the standard is that under the APA.

on the awarding of noncompetitive contracts, and to permit federal agencies to use the competitive methods most conducive to the conditions of the contract." *Rapides Regional Medical Center v. Secretary, Department of Veterans' Affairs,* 974 F.2d 565, 567 (5th Cir.1992) (*citing* S.Rep. No. 50, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 2174).

■ In attempting to reconcile NEPA and CICA, the Court is mindful of the Council on Environmental Quality ("CEQ") advisement that the consideration of alternatives is at the heart of an EIS. *See* 40 C.F.R. § 1502.14; *see also Citizens Against Burlington,* 938 F.2d at 194. "While an agency may decline to give rigorous consideration to proposals that fall far short of the project's Need and Purpose, an agency may not eliminate an otherwise reasonable alternative because it presents only a partial solution to the stated purpose and need for the project." *City of Alexandria v. Slater,* 46 F.Supp.2d 35, 42 (D.D.C.1999). In this case, the government states that the Alternative Scenario was rejected because it fell far short of the government's needs and would not meet the government's goal of increased operational efficiency. *See Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 524 (9th Cir.1994) (holding that proposal that "would not meet the project's goals of reducing traffic congestion" was "properly rejected as not reasonably related to the purposes of the project"). The Court is not persuaded that the government should consider proposals that offer only modified efficiency. The Court upholds the government's decision not to consider plaintiff's Alternative Scenario for the following reasons.

A. *D.C. Circuit Ruling in City of Alexandria v. Slater*

Throughout the brief in support of their motion for summary judgment, plaintiffs cite *City of Alexandria v. Slater,* 46 F.Supp.2d 35 (D.D.C.1999); *rev'd,* 198

F.3d 862 (D.C.Cir.1999), for two propositions: (1) federal agencies are in violation of NEPA if they fail "to analyze all reasonable alternatives to their preferred action when preparing the FEIS." 46 F.Supp.2d at 42; Pls.' Mem. of P. & A. in Supp. of Mot. for Summ.J. at 17 n. 5, and (2) "an agency may not eliminate an otherwise reasonable alternative solely because it presents only a partial solution to the stated purpose and need for the project." *City of Alexandria,* 46 F.Supp.2d at 42; Pls.' Mem. of P. & A. in Supp. of Mot. for Summ.J. at 22. In *City of Alexandria,* the Department of Transportation ("DOT") faced a challenge to its consideration of proposals related to large-scale improvements to the Woodrow Wilson Memorial Bridge. The DEIS published by the DOT discussed six alternatives that involved the construction of a new bridge crossing and improved interchanges as well as an additional alternative that involved repair of the existing Bridge. The FEIS issued by the DOT gave detailed consideration to eight alternative proposals, which included seven "build" alternatives and one "no build" alternative, and compared the proposals on a range of criteria.

Both the DEIS and the FEIS for the project discussed the "build" alternatives that contained twelve lanes; each alternative also contained a lane configuration that separated local and express traffic and contained a lane dedicated for High Occupancy Vehicle ("HOV") usage. "Although the FEIS discussed narrower eight- and ten-lane options, it did not afford them full treatment as formal 'alternatives' because the Administration concluded, on the basis of traffic projections, that narrower river crossings would fall short of meeting the Bridge's long-term traffic needs." *City of Alexandria,* 198 F.3d at 865.

The district court ruled that the DOT violated NEPA by not considering a ten-lane river crossing as a reasonable alternative and affording it detailed consideration. The DOT had maintained that it did not

discuss alternatives with fewer than twelve lanes because they would not meet the Need and Purpose of the project. However, the district court rejected the agency's claim and emphasized that the "Project Need" statement articulated the problem as:

one of addressing the future transportation needs of the region within the context of the Constrained Long–Range Plan for the National Capitol Region. Such a broad statement of Need and Purpose hardly provides an unequivocal basis for eliminating ten-lane alternatives from consideration without rigorous comparison of the environmental, socio-economic, and cultural benefits.

*City of Alexandria v. Slater,* 46 F.Supp.2d at 44.

On appeal the D.C. Circuit overruled the district court and stated that the lower court would be correct in its assessment if the agency had truly characterized its objectives in such general terms. The Court of Appeals found that the agency had "instead focused specifically—in its Statement of Purpose and Need and elsewhere—on the traffic needs that will exist twenty years after the project's approval, and its analyses based on the 2020 traffic projections demonstrate that a ten-lane bridge would be insufficient." *City of Alexandria,* 198 F.3d at 868.

The Court also elaborated on its previous holdings in *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 836 (D.C.Cir.1972) (holding that an agency should not "disregard alternatives merely because they do not offer a complete solution to the problem"), and *Citizens Against Burlington v. Busey,* 938 F.2d 190 (holding that a "reasonable alternative" is defined by reference to a project's objectives). The Court explained that its holding in *Morton* was premised on the national scope of the problem being addressed: " 'When the proposed action is an integral part of a coordinated plan to deal with a broad problem, the range of alternatives that must be evaluated is broadened.' "

*City of Alexandria,* 198 F.3d at 868 (citing *Morton,* 458 F.2d at 835). Thus, because the proposed sale of oil and gas leases to submerged lands in the Gulf of Mexico was a cross-agency effort, a "solution that lies outside of an agency's jurisdiction might be a 'reasonable alternative'; so might an alternative within that agency's jurisdiction that solves only a portion of the problem, given that other agencies might be able to provide the remainder of the solution." *Id.* at 869.

But the court went on to contrast the Wilson Bridge project with the cross-agency project at issue in Morton, stating that "such a holistic definition of 'reasonable alternatives' [as suggested by plaintiffs] would, however, make little sense for a discrete project within the jurisdiction of one federal agency." *Id.* The Court further explained that "the Administration has sole responsibility for solving [traffic] problem[s]; were it to build a ten-lane bridge, no one else would step in and alleviate the congestion that would result. In this context, *it is simply a non sequitur to call a proposal that does not 'offer a complete solution to the problem' a 'reasonable alternative.' " Id.* (emphasis added).

In this case, this Court has the benefit not only of the government's SFO, which "represents a detailed description of PTO's minimum needs for its consolidated headquarters that, for the purposes of NEPA, reflects the underlying purpose and need of the project," Final Fed. Defs.' Opp'n to Pls.' Mot. for Summ.J. at 5, but also a federal court decision upholding the SFO as an accurate representation of the PTO's minimum needs. Another court has determined the SFO to represent the government's minimum needs. Nevertheless, plaintiffs urge this Court to determine that the Alternative Scenario fully meets the Need and Purpose of the project as set out in the EIS despite the Alternative Scenario's failure to meet the requirements of the SFO. *See* Pls.' Resp. to Defs.' Notice of Filing of the Court of Appeals' Decision in

*City of Alexandria v. Slater*, at 2. Given the inability of the Alternative Scenario to satisfy the minimum needs, the Court finds that the government's decision was not "arbitrary and capricious." The Court concurs with the D.C. Circuit in stating that "it is simply a non sequitur to call a proposal that does not 'offer a complete solution to the problem' a 'reasonable alternative.'" *City of Alexandria*, 198 F.3d at 869.

Plaintiffs also argue that the congressionally-approved Prospectus for this project mentions renovation as an alternative but the SFO eliminates the possibility of renovation. The Court disagrees. Renovation is still possible under the SFO although it must still meet the project needs as expressed in the SFO. In fact, plaintiff Smith Realty's Crystal City site consists of six renovated existing office buildings and two new buildings.

In addition, it appears to the Court that plaintiffs would be satisfied if the technical requirements of the project were included in the DEIS despite the SFO's more appropriate location. Ultimately, plaintiffs are attempting to slide their Alternative Proposal under the general nature of the statement of Need and Purpose. The Need and Purpose discusses improving efficiency and upgrading physical facilities, and without the SFO, simple changes could reasonably be considered upgrades. The court in the Eastern District of Virginia has already determined what the minimum needs of the Project are; it just happens to take the form of the SFO. Thus, the Court finds that the D.C. Circuit's recent holding in *City of Alexandria* supports the government's position, and the Court concludes that plaintiffs' Alternative Scenario is not a reasonable alternative under NEPA.

B. *Plaintiff's Ability to Challenge the SFO*

■ A guiding principle throughout the Court's consideration of plaintiffs' NEPA action is that the SFO has been subject to challenge for arbitrariness and capriciousness. As such, the Court also recognizes that "NEPA was not intended to repeal by implication any other statute" and that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." *Flint Ridge Development Co. v. Scenic Rivers Assoc.*, 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). While an agency's obligations under NEPA are clear, Congress intended NEPA to be a supplemental, and not a superseding, statute. *See Environmental Defense Fund, Inc. v. Mathews*, 410 F.Supp. 336, 337 (D.D.C.1976) ("NEPA does not supersede other statutory duties, but, to the extent that it is reconcilable with those duties, it supplements them."). Thus, although an agency cannot define its objectives in unreasonably narrow terms, *see City of Carmel–By–The–Sea v. United States Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997), the SFO in this case was challenged by plaintiffs and determined to represent the government's minimum requirements. *See* Tr., at 55–56; *see also CESC Plaza Ltd. v. United States Department of Commerce*, Civ. A. 98–1837 (E.D.Va. July 29, 1999) (holding that the minimum requirements in the PTO's Solicitation for Offers represents the PTO's needs).

Plaintiffs rely heavily on the general nature of the stated Need and Purpose of the project, which is to "provide a facility that can improve operational efficiency and better meet the needs of PTO's employees and customers." Final Fed. Defs.' Opp'n to Pls'. Mot. For Summ.J. at 4. Taking plaintiffs' argument to its logical conclusion, each bidder would be able to determine and perhaps later to argue whether its proposal actually improves efficiency. The SFO obviates this issue; it lists the minimum needs of what would actually improve efficiency and better meet the needs of the PTO's employees and customers. In fact, the Court of Appeals essentially held the same when it stated that "NEPA's injunction that agencies consider

the environmental impacts of 'all reasonable alternatives' does not substantively constrain an agency's choice of alternatives; to the contrary, it is those very objectives that provide the point of reference for a determination whether an alternative is 'reasonable' in the first place." *City of Alexandria*, 198 F.3d at 867. In this case, the government sought to lease space based on a competitive bid process. Thus, given those objectives, the SFO that came out of the competitive bid process, and the Eastern District's opinion, it is entirely reasonable for the government not to consider plaintiffs' Alternative Scenario.

As the intervenor suggests, this view takes an agency's requirements under NEPA into full consideration and folds them into the competitive bid process, effectively complementing and supplementing an agency's requirements under CICA. *See* Tr., at 54–56. The government's decision not to consider plaintiff's Alternative Scenario was based on a consideration of the relevant factors and not on a clear error of judgment.

### C. *Necessity of the SFO in Preparing the EIS*

■■ In finding that the government did not act in an arbitrary or capricious manner, the Court also finds that an EIS cannot be prepared without knowing what alternatives to consider. *See Kleppe v. Sierra Club*, 427 U.S. 390, 401–02, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Although the plaintiffs contend that its Alternative Scenario meets the essential Need and Purpose of the government, the Court finds that the SFO represents the technical specifications of that very Need and Purpose. Without this representation, the Court would be forced to determine, without any guide, whether or not certain proposals met the general Need and Purpose set forth in the EIS. The Supreme Court addressed the issue of the timing of the preparation of the EIS in *Kleppe*, in which several environmental groups sought to compel the government to prepare an EIS

before further developing the coal reserves in the Northern Great Plains region. The Supreme Court held that:

> In the absence of a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement. Absent an overall plan for regional development, it is impossible to predict the level of coal-related activity that will occur in the region identified by respondents, and thus impossible to analyze the environmental consequences and the resource commitments involved in, and the alternatives to, such activity.

*Id.* In this case, without the SFO in place, the government would not know either what actions or alternatives to consider or what the potential environmental impacts would be. Thus, without the SFO:

> any attempt to produce an impact statement would be little more than a study along the lines of the [Northern Virginia development], containing estimates of potential development and attendant environmental consequences. There would be no factual predicate for the production of an environmental impact statement of the type envisioned by NEPA.

*Id.* at 402, 96 S.Ct. 2718. The *Kleppe* Court pointed out that when the "bounds of the analysis are defined," an "agency can analyze the environmental consequences and describe alternatives as envisioned by [NEPA]." *Id.* at 402 n. 14, 96 S.Ct. 2718. As the government emphasized during the motions hearing, "agencies don't just go out and do NEPA just to do NEPA." Tr., at 32. Therefore, the Court finds that the SFO must be in place in order to trigger the government's obligations under NEPA.

### D. *Other "Contract"-Driven EISs*

The Court also finds that the facts in this case are sufficiently similar to those in other cases in which the contours of the EIS were driven by requirements that were outside the bounds of NEPA. While the Court is well aware that an agency

cannot circumvent NEPA by referring to a narrow contract, at least one court has recently noted the limits that contracts place on an agency's ability to consider alternatives. In *Alaska Wilderness Recreation & Tourism Ass'n. v. Morrison*, 67 F.3d 723 (9th Cir.1995), the Ninth Circuit considered an action that sought to enjoin the United States Forest Service from contracting for harvest of national timber after the cancellation of its 50–year sales contract with the Alaska Pulp Corporation ("APC"). The issue before the court was the adequacy of Environmental Impact Statements that were produced before the contract cancellation.

There, the plaintiffs sought to force the Forest Service to consider other alternatives in light of the fact that, as a result of the contract cancellation, the Forest Service was no longer constrained by the contract's requirements for timber volume. In evaluating the parties' arguments, the Court emphasized in several places the "degree to which the EISs were contract-driven," *id.* at 729, and that each EIS "explain[ed] that the alternatives considered for detailed study were those which met the requirements of the APC contract." *Id.* In addition, the "No action" alternative, which is the "benchmark by which effects of all action alternatives are measured," was not even considered "viable because it would not meet minimum APC contract volume requirements." *Id.* at 730. The Court's review of the EISs led it to conclude that "the Forest Service took into account other needs and uses only to the extent that they permitted contract requirements to be met" and that they could not know "to what extent other alternatives, eliminated from the EISs because they did not meet volume requirements, might have been considered in detail." *Id.; see also Narrows Conservation Coalition v. Grantham,* No. 98–35625, 166 F.3d 1218, 1999 WL 49100, at *3 (9th Cir. Feb.1, 1999) ("While we agree with Narrows' assertion that reliance on either the TTRA[13] or the TLMP[14] in setting the project's purpose does not relieve the Forest Service of its obligation to comply with NEPA, the Forest Service properly relied on these factors when arriving at the target harvest volume.").

■ The degree to which the EIS is SFO-driven in this case is analogous to the APC contract in *Alaska Wilderness.* The SFO has been challenged and upheld as a representation of the minimum requirements for PTO consolidation, and the plaintiffs do not dispute that ruling.[15] As a result, the Court finds it reasonable that once the agency's minimum requirements have been established, the agency cannot and should not consider alternatives that do not meet those specifications.

Similarly, in *City of Tenakee Springs v. Clough,* 915 F.2d 1308 (9th Cir.1990), the court cautioned that the agency's failure to consider seriously any "alternative to the rigid application of its own interpretation of the contract requirements [for timber harvesting] raises serious questions of compliance with the applicable law." *Id.* at 1312. The court reasoned that the contract at issue had been amended eleven times previously and could have been amended again. Here, the government's adherence to the SFO is understandable in light of the procedural posture of this liti-

13. The Tongass Timber Reform Act, Pub.L. No. 101–626, 104 Stat. 4426, was enacted to protect certain lands and riparian habitats in the Tongass National Forest.

14. The Tongass Land Management Plan established general goals for the land in the Tongass National Forest.

15. The plaintiffs argue that although the court in the Eastern District of Virginia determined that the SFO is not arbitrary or capricious with regard to CICA, it still may be arbitrary and capricious in light of NEPA. *See* Tr., at 59–62. Given the operation of the two statutes in tandem, this Court is uncertain how it could apply an "arbitrary and capricious" standard that is different from the one that the court in the Eastern District of Virginia previously applied.

gation. The SFO (contract) was amended throughout the competitive bid process, heavily litigated, and determined to be a representation of the government's minimum needs. Thus, this Court has the benefit of a well-reasoned federal opinion that ultimately frames the agency's need to consider alternate proposals and is able to rely upon that Court's decision instead of the agency's own interpretation.

### E. Unreasonableness of the Alternative Scenario

Finally, the Court also notes that the purpose of NEPA is for the government agency to make a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action. *See City of Carmel–By–The–Sea,* 123 F.3d at 1150. An agency "need not consider all possible alternatives for a given action, nor must the agency select any particular alternative. Rather, the agency must consider a range of alternatives that covers the *full spectrum of possibilities.*" *Sierra Club v. Watkins,* 808 F.Supp. 852, 872 (D.D.C.1991) (emphasis added). The Court is mindful of the D.C. Circuit's requirement of "strict compliance" with NEPA's "inflexible" procedural requirements but concludes that the government's decision not to consider the Alternative Scenario was reasonable, given the similar environmental effects of the "No Action" alternative and the "Alternative Scenario."

### IV. The Government's Definition of "No Action"

NEPA requires agencies to consider the environmental consequences of an agency's decision to take "No Action." Plaintiffs argue that the government illegally redefined the "No Action" alternative from the DEIS to mean "Action" in the FEIS. Plaintiffs assert that the government incorrectly interprets "No Action" to mean that other buildings will be built on the two sites in Alexandria instead of the PTO and insist that "No Action" means maintaining the status quo. The government counters that the foreseeable uses of the property indicate that it would be developed whether the PTO consolidation took place or not and that to consider such anticipated development is a reasonable judgment call.

The inclusion of foreseeable development in evaluating a "no Action" alternative was followed in *Nashvillians Against I–440 v. Lewis,* 524 F.Supp. 962 (M.D.Tenn.1981). In *Nashvillians,* plaintiffs also argued that a "No action" alternative meant a "do nothing" alternative. There, as here, plaintiffs pointed to a CEQ informational memorandum that states that "it is difficult to think of a situation where it would not be appropriate to address a 'no action' alternative." 46 Fed. Reg. 18,026, 18,027 (1981); *see also* Pls.' Mem. of P. & A. in Supp. of Mot. for Summ.J. at 26 ("The no action alternative is, in the words of this Court, the 'most significant alternative, since only an adequate explanation for its rejection can provide the new program with its very *raison d'être.*'") (citations omitted). The *Nashvillians* court noted, however, that:

in the same memorandum CEQ recognizes that *where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis.* For example, if denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze the consequence of the "no action" alternative.

524 F.Supp. at 988; *see also* Fed.Reg. 18,026. The obvious implication is that where, as here, a decision by the government not to consolidate its facilities on undeveloped land would result in significant private commercial and residential development on the vacant property, the consequences of that alternative development should be addressed. The "No Action" alternative does nothing more than that. *See* 524 F.Supp. at 988. *See also, Commu-*

*nities, Inc. v. Busey,* 956 F.2d 619, 626 (6th Cir.1992) (upholding an agency's "No Action" analysis that assumed certain neighborhood demolition would take place whether or not the proposed airport expansion went forward). It is worth noting that the Environmental Protection Agency reviewed the modification in the "No Action" scenario and endorsed the change. *See* Admin. R. at 015000.

Thus, this Court finds that the government's view of the "No Action" alternative is reasonable.

## V. The Agency's "Hard Look" at Environmental Impacts

Another substantive area of this litigation concerns the agency's "hard look" at various environmental impacts. The CEQ regulations provide that an environmental impact statement "shall [contain] a full and fair discussion of significant environmental impacts" and that "[i]mpacts shall be discussed in proportion to their significance." 40 C.F.R. §§ 1502.1, 1502.2(b); *see* NEPA § 102(2)(C)(i), (ii), 42 U.S.C. § 4332(2)(C)(i), (ii); *see also Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190 (D.C.Cir.1991). In other words, NEPA requires agencies to take a "hard look" at the environmental impacts of a proposed action. To satisfy this "hard look" requirement, agencies must consider the environmental effects of their actions "to the fullest extent possible." *City of Alexandria v. Slater,* 46 F.Supp.2d 35, 43 (D.D.C.1999). Specifically, "the FEIS must identify and analyze the effects the project is projected to have on environmental factors." *Id.* at 45 (citing *NRDC v. Hodel,* 865 F.2d 288, 294 (D.C.Cir.1988)).

Courts have applied a "rule of reason" to "determin[e] whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *City of Carmel-By-The Sea,* 95 F.3d at 899. The court must look to whether the agency has gone "beyond mere assertions and indicate[d] its basis for them." *Dubois,* 102 F.3d at

1287. More importantly, the Court must ensure that the agency has fully explicated "its course of inquiry, its analysis and its reasoning." *Id.* In addition, the court "must determine whether, in the context of the record, the agency's decision—and the analysis on which it is based—is too unreasonable for the law to permit it to stand." *Id.* (citation omitted). Reviewing courts must apply a rule of reason because they should not "fly speck" an EIS and "hold it insufficient based on inconsequential or technical deficiencies." *Id.* (citation omitted).

In this case, plaintiffs argue that the government failed to take a "hard look" at the impact of government buildings on (1) the Alexandria neighborhood, (2) the cumulative traffic impacts, (3) hazardous waste issues, (4) historic resources, (5) air quality, and (6) environmental justice.

## A. Impact of Government Buildings on the Alexandria Neighborhood

Plaintiffs first argue that the government failed to examine adequately the impact of the government buildings on the Alexandria neighborhood. Essentially, plaintiffs state that the government did not address the neighborhood residents' severe criticism of the Carlyle site. The residents worry that building a "massive" government complex next to a residential neighborhood will "dramatically and permanently harm the environment of this Alexandria neighborhood." Mem. of P. & A. in Supp. of Mot. for Summ.J. at 31–32. Plaintiffs' primary concern is that the PTO project conflicts with the original neighborhood plan, which called for mixed use of the land, with some residential and some commercial development. *See* Admin. R., at 000673; Admin. R., at 000680–000681; *see also* FEIS, at B.5–4.

The government maintains that it examined the potential impacts of the proposed consolidation project on the neighborhood in great detail, including land use and planning issues, zoning impacts, and

visual impacts.[16] According to the government, plaintiffs' criticisms focus on six letters submitted by Carlyle residents as well as the testimony of two citizens at the public hearings.

■ Upon review of the Administrative Record, the Court agrees with the government that:

[t]hese letters, primarily from individuals in the Carlyle neighborhood who oppose the proposed action, raised issues dealing with traffic, zoning, visual impacts and potential impacts to historic resources. These comments did not contain any new information concerning these resource impacts, nor did they raise additional concerns with specific impacts that had not been analyzed in the DEIS.

Admin. R., at 000666–000724. The Court finds that most of the comments focus on the desires of residents for the government to take the proposed project elsewhere because it would overwhelm the mixed-use community. However, the Court determines that the government has adequately examined these impacts, as demonstrated by the following review of the EIS.

First, the DEIS begins its discussion of the Carlyle site by describing it as being "located within a 16–block (76–acre) planned mixed-use development" in Alexandria, Virginia. See DEIS, at 3–10. The DEIS notes that the United States Courthouse, the Carlyle Towers, and the Time Life Building were the first-built elements of the mixed-use plan, and the DEIS lists the relevant square feet of office, residential, and retail space planned for the area. See DEIS, at 3–10.

With respect to land use and planning issues, the DEIS contains a lengthy discussion of the three proposed sites and includes detailed maps that represent, *inter alia*, the current commercial, and residential usage of the land. See DEIS, at 3–9 – 3–14. The government noted that all three sites fall "within the region for which the National Capital Planning Commission (NCPC) prepares land use plans and policies for federal facilities and lands." DEIS, at 3–14. As such the government was quite mindful of the NCPC objective to "[e]ncourage mixed uses within Federal buildings when economically feasible and consistent with the building design." DEIS, at 3–16.

Similarly, the DEIS discusses the City of Alexandria's Small Area Plan for the King Street/Eisenhower Avenue Metrorail Station, which designates the Carlyle site as part of the Duke Street Coordinated

---

**16.** Although the plaintiffs' briefs do not specifically focus on visual impacts, the Court also finds that the government included a detailed and thorough analysis of the visual impacts at each of the proposed sites. The visual impact assessment was based on "standard visual impact methodology including review of proposed plans, sections, elevations and models for each site, review of existing data on building heights and elevations in the areas surrounding the alternative sites, and an assessment of potential views along existing view corridors." DEIS, at 4–50. In addition, the government assessed the potential views along the corridors by using photographs and computerized visual simulation techniques. As such, the discussion is replete with "before and after" pictures that simulate the visual impact of the proposed consolidation and measures that can be taken to mitigate the views. See DEIS, at 4–56 – 4–58, 4–62, 4–64 – 4–65, 4–69 – 4–70, 4–72.

The government concluded that the "[Carlyle] development would completely change the visual character of the existing site," which is currently undeveloped. DEIS, at 4–59. The government also assessed the visual impact on the area from a variety of locations and determined that the project would have minor to moderate visual impacts on certain views. See DEIS, at 4–61 – 4–66. Ultimately, however, the government concluded that in light of the poor visual quality of the current site and the mixed-use development plans, "the proposed PTO complex at Carlyle would have a positive visual effect on the site." DEIS, at 4–61. Thus, the Court is satisfied that the government's discussion is "reasonably thorough" and that the government has taken a hard look at the visual impact of the proposed PTO consolidation.

Development District ("CDD"). The Duke Street CDD specifies that development on the Carlyle site should provide "a mix of uses to include office, retail, residential, hotel, and support facilities including active and passive recreation and day care centers." DEIS, at 3–24. The DEIS also notes that the Carlyle development project was issued a CDD Special Use Permit in April 1990, which "entitles the project to be developed [in a manner consistent] with the uses and gross square footage" set forth in Table 3.2.2–1 [17] of the DEIS. *See* DEIS, at 3–25, 3–27.

As part of its analysis of neighborhood impacts, the government concedes that implementation of the PTO consolidation at the Carlyle site would be "inconsistent with the approved development plan under the CDD Special Use Permit" due to the inclusion of two above-grade parking structures and the closing of two streets, both of which change the circulation throughout the development. The government also admits that the proposed concentration of office space in the center of the development is inconsistent with the CDD, which supports the distribution of office, residential, retail, and hotel space throughout the development. The ultimate conclusion, however, was that despite these inconsistencies, "the PTO complex would not alter the final overall mix of office, retail, and residential uses within the Development District as specified in the CDD zoning." FEIS, at B.5–5. Taken as a whole, the government's discussion of the environmental impact on Alexandria neighborhood is sufficiently thorough and satisfies the "hard look" requirement.

## B. *Cumulative Traffic Impacts*

Plaintiffs allege that GSA has failed to give adequate attention to the traffic impacts of the proposed consolidation at one of the Alexandria sites, particularly the cumulative impacts of the consolidation in conjunction with other planned developments in the area. Plaintiffs contend that the EIS does not evaluate the cumulative impacts of planned construction at the Woodrow Wilson Bridge, the Springfield Interchange of the Beltway (known as the "Mixing Bowl"), and the construction of the National Harbor project immediately adjacent to the Woodrow Wilson Bridge, as well as the impact of the potential PTO site itself. The government counters that it has thoroughly reviewed the traffic issues of the proposed PTO consolidation; it states that it set forth the basic methodology for its analysis of traffic impacts in the vicinity of the alternative sites, considered any increased travel time for PTO employees, completely analyzed potential traffic impacts, and reasonably identified mitigation measures.

The government begins its analysis of the traffic impacts by discussing the highway and transit systems that residents use to travel through the Washington, D.C. metropolitan area. *See* DEIS, at 3–95 – 3–97. The DEIS then looks at the current employee travel patterns by considering where employees live and how and when they travel to work. *See* DEIS, at 3–97 – 3–100. The government then explains the methodology for its analysis of the traffic impacts in the vicinity of the alternative sites. The DEIS applied the 1994 Highway Capacity Manual, which the government claims is the standard industry procedure for determining the ratio of traffic volume to available roadway capacity, or volume-to-capacity ("V/C").[18] The government considered the congested nature of the Washington metropolitan area, acknowledging that the "area is among the nation's most congested," DEIS at 4–79, and is expected to worsen. *See* DEIS at 4–79. The government evaluated the V/C ratio for twenty-one intersections, of which fourteen currently operate under capacity

---

**17.** Permitted Uses and Gross Square Footage–Carlyle Site.

**18.** In addition, plaintiff Smith Realty's consulting firm, Callow Transportation Consulting, used the same Manual as the basis for some of its comments. *See* FEIS, at C–312.

during both morning and afternoon peak periods.

The Court finds that most of the initial issues raised by the plaintiffs in their brief, such as estimates of off-peak travel conditions and "quantification of the reduction on capacity and the resulting increased travel time for PTO employees", *see* Pls.' Mem. of P. & A. in Supp. of Mot. for Summ.J. at 34–5, venture into areas of agency expertise on which this Court is neither qualified nor advised to pass judgment.[19] The Court is in no position to determine whether the government needed to include this data in order to assess traffic impacts. In fact, in areas requiring technical expertise, a reviewing court is usually at its most deferential. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *see also Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Court is satisfied that, with respect to these methodology disputes, the government has made a serious attempt to identify and analyze the traffic impacts of the development of each of the alternative sites.

The second area of criticism is the issue of cumulative traffic impacts, particularly those associated with the proposed replacement of the Woodrow Wilson Bridge and improvements to the Mixing Bowl. The CEQ Regulations define "cumulative impact" as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative

impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. The standard for determining the adequacy of the EIS is whether the agency reasonably identified and discussed various impacts. *See Tongass Conservation Society v. Cheney,* 924 F.2d 1137, 1140 (D.C.Cir.1991). Plaintiffs are correct that the DEIS does not contain a clear discussion of these issues. Even the analysis contained in the FEIS, in direct response to comments on this issue, is far more cursory than the agency's analysis of other traffic impacts.

However, the GSA did consider cumulative impacts in various aspects of its traffic analysis. First, as the government indicates, the initial tier of its traffic analysis incorporated regional traffic projections compiled by Metropolitan Washington Council of Governments. The DEIS also relied upon projections from the Virginia Department of Transportation ("VDOT"), both current and for 2003 (the year selected by the initial "scoping" process as the appropriate analysis year for future traffic impacts), that reflected regional demand and road construction projects. Additionally, in response to comments on the DEIS, the government gave a more explicit account of its methodology and reasoning with respect to cumulative traffic impacts in the FEIS. See FEIS at B–2 – B–4. The report concludes that:

> there would be no cumulative impacts associated with the consolidation of the PTO at the proposed Alexandria sites (Carlyle or Eisenhower) because (1) the timing and sequence of the unrelated traffic improvements would not interfere with the PTO sites, and (2) the Congestion Management Plans prepared and

---

**19.** Plaintiffs also state that the government failed to adopt and rely upon an EIS prepared for the Navy in the early '90s. The two projects are distinguishable if only because the Navy project assessed the impact of 21,000 employees whereas the PTO project involves only 7,100 employees. *See* Admin. R., at 014797. In addition, many transportation improvements have been made in the area since the Navy study, and the Navy project "applied a higher level of service standard" than the PTO project. *Id.* The memorandum also concluded that the PTO DEIS is not the appropriate document for comparing the Navy DEIS. *See* Admin. R., at 014797.

implemented by state officials would adequately address traffic created by those projects.

Mem. of P. & A. in Supp. of Fed. Defs. Mot. for Summ.J. at 29 (emphasis added); *see also* FEIS, at B.8–2 – 8–3.

Specifically, the government states its reliance upon the demand forecasts and Congestion Management Programs prepared by the Virginia Department of Transportation ("VDOT") with respect to the Wilson Bridge and Mixing Bowl construction projects. The government relies upon the stated commitment of the VDOT to "maintain[ ] current levels of transportation service during peak traffic periods for both projects." FEIS, at B.8–3. This assumption is reasonable, the FEIS suggests, because of the success of the Congestion Management Program ("CMP") in maintaining traffic flow through the widening of Interstate 66, as documented in a VDOT report on the I–66 project. *Id.* The comments also reference the EIS for the Wilson Bridge Construction Project, and its discussion of the many planned road projects related to that project.

■ As this Circuit made clear in *Coalition on Sensible Transportation, Inc. v. Dole*, 826 F.2d 60 (D.C.Cir.1987), an agency is not required to duplicate the analysis of earlier studies when considering cumulative impact, but rather may incorporate the findings of a previous study into the background data used to assess the impact of the new project. *See Coalition on Sensible Transportation, Inc.*, 826 F.2d at 70 (stating "[i]t makes sense to consider the 'incremental impact' of a project for possible cumulative effects by incorporating the effects of other projects into the background 'database' of the project at issue, rather than by restating the results of the prior studies.") The government maintains it has done so here. *See* Fed. Def.'s Mot.Summ.J. at 31.[20]

Essentially, the agency relies on VDOT's CMP to determine that there will not be a significant impact on traffic from the construction projects at the Springfield Interchange and the Wilson Bridge. In addition, the agency relies on its own proposed traffic mitigation measures to offset the detrimental impact of the PTO project itself (treating the Eisenhower and Carlyle sites as the same for purposes of this traffic analysis). *See* DEIS at 4–93. That analysis makes reference to the EIS prepared for the Wilson Bridge construction project, substantiating to the agency's claim that it studied that document and incorporated its findings into the assessment of the PTO project. *Id.*

■ While the agency would have done well to provide a more extensive discussion of these issues, the Court finds that the information it did supply was sufficient to indicate that it considered these traffic impacts and to facilitate meaningful comment on the issue. Critics may disagree with the agency's wisdom in relying on the VDOT forecasts for managing the Wilson Bridge and Mixing Bowl construction projects, but the Court does not believe such analysis is "too unreasonable for the law to permit it to stand." *Dubois*, 102 F.3d at 1287.

### C. *Hazardous Wastes*

Plaintiffs' next argument is that the government violated NEPA by leaving hazardous waste concerns largely unaddressed by the DEIS and FEIS. First, plaintiffs argue that excavation at the Eisenhower site has increased from 194,000 cubic yards of unknown materials to 450,-000 cubic yards, without any mention of the expected environmental impacts associated with the excavation. Next, plaintiffs assert that the 1997 site assessment of the Eisenhower site used by the govern-

---

**20.** The FEIS also specifies its own limitations; the scoping process selected 2003 as the proper year to assess future transportation impacts, therefore the EIS does not address the cumulative impact on traffic once the Wilson Bridge and Mixing Bowl projects are completed. FEIS at B.8–3.

ment was deficient and did not locate any hazardous wastes because it involved only four samples and missed wastes that were found in a 1995 investigation. Finally, plaintiffs point out that a full delineation and characterization of the contaminants found at the Carlyle site was not provided.

The government maintains that there is extensive discussion of the hazardous waste issue at all the alternative sites. *See* Mem. Of P. & A. in Supp. Of Fed. Def.'s Mot. For Summ.J. at 23. As the government acknowledges, the Environmental Protection Agency indicated that GSA should look at additional information with regard to hazardous wastes before preparing an FEIS. *Id.* at 24. Once GSA produced a chart with additional information on hazardous waste issues at the proposed sites, EPA stated that its concerns had been " 'adequately addressed.' " *Id.*

The Court agrees with plaintiffs that the record points to inconsistent information regarding the existence of hazardous materials at the Eisenhower site. However, it does not necessarily follow that the agency has failed to meet its responsibilities under NEPA. Here, GSA acknowledged the discrepancy in the studies at the site, FEIS at B.9–11, and determined that the proposed remediation measures would be sufficient to deal with whatever hazardous wastes might be encountered at the site. The EPA was satisfied with the evaluation for this stage of the process, suggesting that more study should be done on the site ultimately selected for the project. *See* Mem. Of P. & A. in Supp. of Intervenor–Def. Mot.Summ.J. at 28–9.

Finally, plaintiffs argue that a full delineation and characterization of the Carlyle site is needed because of previously identified contaminants. The government responds that the:

> Carlyle property exhibits soil contamination and the presence of hazardous materials to the extent that it is likely that

further sampling will be needed both before and during any construction activities. It is also likely that such materials will be found during construction and that the presence of contaminated soils will result in treatment and/or removal costs. However, since the likely presence of these materials is known, and since the Carlyle site developers have a reasonably good idea of both the nature of and the most probable location of such hazardous materials based on the testing and remediation conducted to date, it is probable that the construction project can be planned to ensure the proper identification, treatment and/or removal of any such materials in accordance with all applicable local, state, and federal regulations.

FEIS at B.9–10.

The comments plaintiffs cite for their assertion that a full delineation and characterization of the site is necessary state that it is doubtful that "an accurate estimate can be prepared ... as full delineation and characterization has not been completed." Admin. R., at 000039. Those comments do not state, however, that such a characterization is necessary, but instead that a pattern of problems similar to those previously detected may be encountered on the remaining parcels. Admin. R., at 000038. Table 9–3 of the FEIS [21] summarizes the available documentation of investigation/remedial actions for the alternative sites and lists activities on the Carlyle site from January 1989 through March 1998. The summary of the Carlyle site takes up almost three pages and contains almost four times as many investigations as any other site. *See* FEIS, at B.9–20 – B.9–23. While the hazardous waste problems on the site indicate that more contaminants may be found, the Court is satisfied that the decade of testing of the site may reasonably provide devel-

---

21. Summary of Available Documentation of Investigation/Remedial Actions for the Alter-

native Sites.

opers with an idea of where the contaminants may be located without further delineation and characterization.

 Therefore, this Court rejects the need for a new delineation at the Carlyle site sought by plaintiffs and finds that the government has taken a sufficiently "hard look" at the hazardous waste issues with respect to soil excavation and site assessment at the Eisenhower site.

### D. *Historic Resources*

Plaintiffs argue that the government failed to examine impacts on historic resources adequately and to avert such impacts. Plaintiffs focus on the demolition of a historic railroad Roundhouse at the Carlyle site. Plaintiffs contend that the only reason the EIS contains no mention of comments by the Virginia State Historic Preservation Office ("SHPO") is that the government did not furnish the SHPO with a copy of the EIS until after the close of the comment period. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Summ.J. at 40. The government counters that they incorporated many of the comments from the Virginia SHPO and that the head of the Virginia Department of Historic Resources[22] was on the mailing list of federal and state officials that received the DEIS. The government also argues that when they learned that the Roundhouse was scheduled to be demolished, they took immediate steps to forestall its demolition, including sending several letters to the LCOR, the offeror and intervenor. In addition, the government states that the master development plan for the property provided for the demolition of the Roundhouse.

### 1. *Receipt of the DEIS*

Although the record indicates that the SHPO did not receive the DEIS until July 10, 1998, *see* Admin. R., at 014440, the record also reveals that the SHPO had ample opportunity to comment upon the information that was to appear in the DEIS. For instance, the April 1, 1998 letter from the Department of Historic Resources states that the Department received the government's "submission of the draft Section 106[23] documentation of the proposed consolidation of the U.S.Patent and Trademark Office in Northern Virginia" and included the agency's review of the information and comments. Admin. R., at 014389. Moreover, the government responded to a letter from the SHPO, clarified and expanded on various points raised by the SHPO's letter, and agreed to make relevant changes in the DEIS. *See* Admin. R., at 014443. In addition, a June 29, 1998 letter to the Advisory Council on Historic Preservation (ACHP) included the comments from the Virginia SHPO. Finally, David Dutton, the head of the Virginia Department of Historic Resources, was on the mailing list for federal and state officials that received the DEIS. *See* DEIS, Appendix B, at B–3. Thus, plaintiffs claim that the government failed to circulate the DEIS for comments is unfounded.

### 2. *Demolition of the Historic Roundhouse*

Plaintiffs also argue that the government failed to prevent the destruction of a historic roundhouse in Alexandria on the Carlyle site. The historic Roundhouse,

**22.** In Virginia the State Historic Preservation Office is called the Department of Historic Resources.

**23.** Section 106 of the National Historic Preservation Act provides that any agency having jurisdiction over a federally-assisted project "shall, prior to the approval of expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking on [any district, site, building, structure, or ob-

ject that is included or eligible for inclusion in the National Register]." 16 U.S.C. § 470f; *see also City of Alexandria,* 46 F.Supp.2d at 46. "Under regulations implementing Section 106[GSA] is required to identify historic properties within the area of potential effects of the project, and must perform an analysis of the likely impacts on those properties." *City of Alexandria,* 46 F.Supp.2d at 46; *see also* 36 C.F.R. Part 800 (1998).

first constructed in 1916–1917, was capable of housing twenty locomotives. *See* Admin. R., at 014311. The Administrative Record indicates that GSA took steps to prevent the destruction of the Roundhouse. In a letter dated January 29, 1998, GSA warned LCOR that "any action that affects the potential historic nature of [the roundhouse] could have negative ramifications under current law and specifically with respect to GSA's consideration of [LCOR's] proposal." Admin. R., at 014456. Furthermore,

> [d]espite its consistent efforts, GSA was unable to prevent, or even delay, the demolition of the roundhouse before completing its review and analysis of the site and LCOR's offer. We believe that GSA's letter to LCOR warning of 'negative ramifications under current law' demonstrates that GSA understood its responsibilities pursuant to Sections 110(k) and 106 of the NHPA and that it had adequately advised LCOR about their concern for the fate of the roundhouse.... GSA's efforts might have been more effective had it provided LCOR with explicit and detailed information about the NHPA and the scope and extent of the 'negative ramifications' that it foresaw.

Admin. R., at 014457.

Although the ACHP concluded that "the record ... suggests that LCOR and the property owner undertook a course of action to remove the roundhouse from the site to eliminate what they perceived as a potential impediment to GSA's consideration of LCOR's offer," Admin. R., at 014457, the ACHP stated that the next step was for GSA to determine if LCOR and the property owner intended to avoid the requirements of Section 106. *See* Admin. R., at 014457. GSA determined that "the offeror did not intend to avoid the requirements of Section 106 and the circumstances justify keeping the offeror in the competition despite the demolition of the historic roundhouse structure." Admin. R., at 014458.

GSA found "no intent on the part of [LCOR] or the owner of the property to avoid the requirements of Section 106." Admin. R., at 014459. GSA concluded that the property owner had been working with the City of Alexandria since at least 1988 to secure approval of a master development plan for its property:

> To mitigate the adverse effects caused by the demolition of the [roundhouse], the property owner and the City of Alexandria entered into a Memorandum of Understanding whereby the owner agreed to prepare extensive documentation depicting the existing condition of the roundhouse prior to its demolition. The City of Alexandria worked closely with the owner to develop the scope of work for this required mitigation. The owner did what is commonly done in similar situations to mitigate such an adverse effect, and in this case, all that would have otherwise been required pursuant to Section 106.

Admin. R., at 014459.

The Administrative Record appears to support the government's contention that the roundhouse was scheduled for demolition long before the current PTO project. In fact, the Intensive IPS form indicates that "[i]n c.1995, City of Alexandria required some black-and-white (35mm) photos of [the roundhouse] prior to planned private demolition under its city archaeology ordinance." AR 014315. The Memorandum of Understanding between the City of Alexandria and Alexandria–Southern Properties, signed in October 1993, indicates that the buildings on the property were scheduled to be demolished three to five years from the date of the Agreement. *See* AR 014321–014322. Apparently, demolition was scheduled in the early 1990s and completed in the late 1990s because not much was known about the roundhouse. *See* AR 014315 ("[P]rior to completing this intensive survey form, there was very little, if any, text written about its history and significance."). As a result, the Court concludes that the demo-

lition was not intended to avoid Section 106 requirements, that the government's position on the roundhouse was entirely reasonable, and that the DEIS discussion constitutes a "hard look."

### 3. *Discussion of the Roundhouse in the DEIS*

■ LCOR requested that the DEIS not include the destruction of the structure for two reasons. In addition to the mootness of the issue, *see* Admin. R., at 014384; *see also* Tr., at 29 (Court's questioning of plaintiffs' counsel as to the remedy of the roundhouse destruction), LCOR stated that:

> the disposition of [the roundhouse was] in no way whatsoever associated with any "Federal action". Demolition was decided upon years before the publication of the PTO solicitation. The structure would be demolished even if no PTO award [were] made. The demolition [was] a part of the Land owner's long standing and continued development of the overall Carlyle project. Lastly, the demolition is not related to our offer. LCOR holds only an option to buy certain land in Carlyle. LCOR does not own the round house or the land surrounding it. LCOR has no ability to stop the land owner from developing adjacent blocks or knocking down the small portion of roundhouse on the land we have optioned. For these reasons, we request that the structure not be referenced in the Draft EIS.

Admin. R., at 014384–014385. Given the previous discussion of the plans for the demolition in the early 1990s, which was well before the PTO project, it is quite reasonable that although the demolition may be of interest, it was not part of any federal action and, therefore, not required to be discussed in the DEIS.

### 4. *Archaeological Resources*

The final historic issue is whether GSA adequately addressed archaeological resources. Plaintiffs rely upon a letter from the Virginia SHPO that states that "[b]ased upon the information provided in this summary document, we cannot agree that no further archaeological investigations are warranted at [the Carlyle] site." Admin. R., at 014441. The FEIS and other documents in the Administrative Record indicate that the government is aware of and completely amenable to further archaeological investigation. The Virginia SHPO will have an opportunity to provide further input on the need for archaeological testing in relevant portions of the Carlyle site. *See* FEIS, at B.7–3. Moreover, after the issuance of the FEIS, GSA included Amendment Number 14 to the SFO, which "requires the Lessor, within 180 working days after the award of the Lease, to coordinate the preparation and execution of a Memorandum of Agreement related to the NHPA Section 106 process." Admin. R., at 016062. Therefore, the Court is satisfied with the government's focus on archaeological resources.

### E. *Air Quality Impacts*

Plaintiffs argue that the government failed to examine air quality impacts adequately. The government argues that neither plaintiffs' comments nor their motion for summary judgment produces any evidence that the government's analysis of air quality impacts was done unreasonably. In addition, the government argues that the FEIS addresses in detail, with supporting data, the air quality "conformity" [24] issue to which plaintiffs refer.

The Washington, D.C. metropolitan area is subject to a State Implementation Plan, which is designed to help the region reach federal standards for ozone precursor emissions by 1999. *See* FEIS, at B.9–3 – B.9–4. "The proposed action would need to

---

**24.** Conformity refers to "the air emissions associated with a proposal being able to conform to the limits set for the air implementa-

tion plan applicable to the affected geographic area." Mem. of P. & A. in Supp. of Pls.' Mot. for Summ.J. at 40.

'conform' to the region's SIP if the expected emissions of ozone precursors exceed certain limits." Mem. of P. & A. in Opp'n to Pls.' Mot. for Summ.J. at 33. "[T]he emissions inventory takes into account both mobile[25] and stationary source[26] emissions associated with future employment and growth projected to occur within the various jurisdictions of the greater Washington, D.C., metropolitan area, including future growth within the Crystal City and Alexandria areas." FEIS, at B.9–4.

■ The Virginia Department of Environmental Quality Regulation for General Conformity provides for a conformity determination "if the proposed PTO consolidation results in emissions of ozone precursor ([volatile organic compounds or nitrogen oxide]) that equal or exceed 50 tons per year, or emissions of [carbon monoxide] that equal or exceed 100 tons per year." FEIS, at B.9–4. For all the alternatives considered, GSA determined that "[t]he net increase in emissions of [carbon monoxide], [nitrogen oxide,] and [volatile organic compounds] would not exceed thresholds established by the Virginia Department of Environmental Quality." Mem. of P. & A. in Opp'n to Pls.' Mot. for Summ.J. at 33; *see also* FEIS, at B.9–4 – B.9–5. As a result, GSA concluded that a formal conformity determination was not necessary.[27] FEIS, at B.9–4, Table 9.2 at B.9–5. Thus, the Court is satisfied that the government's discussion of air quality impacts is sufficiently thorough to constitute a "hard look."

25. "Mobile source emissions refer to emissions generated by motor vehicle and equipment use, including tailpipe and evaporative emissions." DEIS, at 4–104.

26. Stationary source emissions are generated by electricity and natural gas consumption. *See* DEIS, at 4–103.

27. GSA determined that "the Alexandria alternatives would not result in a direct net increase in regional mobile source emission levels because trips would be relocated within the same air basin." DEIS, at 4–105.

## F. *Environmental Justice*

Finally, plaintiffs argue that the government failed to analyze adequately the Environmental Justice[28] implications of the PTO project. They state that "[o]nly through the most meticulous parsing of the FEIS can one discern that the selected Carlyle site is in a census tract and block where the minority population exceeds 80% without any attempt by GSA/PTO to analyze the Environmental Justice implications." Mem. of P. & A. in Supp. of Pls.' Mot. for Summ.J. at 41 (citation omitted). The government states that in response to comments from the EPA, the FEIS included a detailed analysis of the proposed action's potential impacts on minority or low-income populations consistent with the President's Executive Order on Environmental Justice. The government concludes and plaintiffs do not dispute that the proposed action is not expected to have any adverse impacts to residents in the Carlyle or Eisenhower study area and will have no adverse impacts related to housing or demographics.

■ In reviewing the FEIS, this Court was able to discern fairly quickly that the selected Carlyle site was eighty percent minority. *See* FEIS, at B.6–4 – B.6–5. The government first sets forth the methodology used for its analysis. *See* FEIS, at B.6–1 – B.6–2. The FEIS then identified the potential Environmental Justice communities, *see* FEIS, at B.6–2 – B.6–5, and potential minority businesses, *see* FEIS, at B.6–5, that could be affected by the PTO

28. For the purposes of the government's analysis, an Environmental Justice community was identified as a "block group in which (criterion a) more than 50 percent of the population is below the poverty level, (criterion b) more than 50 percent of the population is minority, or (criterion c) the minority population percentage of the block group is greater than the minority population percentage of the city/county." FEIS, at B. 6–1.

project. While the overall discussion of impacts is not extensive, it is adequate—especially when read in conjunction with the referenced sections of the EIS regarding potential adverse impacts on human health and historical and cultural resources. There is greater detail in the discussion of potential impacts on minority businesses, identifying a potential short-term negative impact on minority-owned business at the Crystal City site in the event of a consolidation at one of the Alexandria sites. However, the FEIS concludes that any such impact would be mitigated through a phased-move from the existing site. The Environmental Protection Agency, which had raised certain concerns with the treatment of environmental justice concerns in the DEIS, was satisfied with the government's changes in the FEIS. Fed. Def.'s Opp'n. to Pls.' Mot. Summ.J. at 35. The Court finds that the agency has met its obligation to take a "hard look" at environmental justice concerns.

## VI. *Preparation of a FEIS*

Plaintiffs argue that the government failed to prepare a full Final Environmental Impact Statement. They argue that NEPA requires a DEIS to be circulated, comments are made on the DEIS, the EIS is rewritten, and the EIS is recirculated as a FEIS, after which comments are submitted. Plaintiffs claim that the government merely added an introduction, comments, errata, and responses to comments—an abbreviated process that is precluded if the changes to the EIS involved: (1) modification of alternatives; (2) the development and evaluation of alternatives not previously given serious consideration by the agency; and (3) supplementation, improvement, or modification of the analysis. *See* 40 C.F.R. § 1503.4(c). Plaintiffs contend those factors are present here, and thus the government was required to produce a full FEIS—if not a revised or supplemental EIS and then an FEIS. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for Summ.J. at 27–30.

The government argues that it did produce a full and valid FEIS, that nothing in the CEQ Regulations prohibits the format that they used, and that the chosen format does not compromise the " 'objectivity and integrity of the NEPA process.' " *See* Fed. Defs.' Opp'n. to Pls.' Mot. for Summ.J. at 15. Moreover, the government argues that even if this format is not in accordance with CEQ regulations, this trivial violation would not prejudice the parties.

█ The Court is persuaded that the government's chosen format for the FEIS is acceptable and does not indicate that the final draft was, overall, inadequate. As the government points out, the regulations do not prescribe any specific format for the FEIS or dictate that it be issued as a single volume. Mem. of P. & A. in Supp. of Fed. Def.'s Mot. for Summ.J. at 35. Rather, the regulations specify that certain information be addressed in the FEIS. *See* 40 C.F.R. § 1502.10. The Court finds that the government complied with the regulations here, and therefore generally met the requirement to issue a "full" final EIS.

Nevertheless, the Court must address plaintiff's concerns that the government improperly shortchanged comment and deliberation on modifications in the original alternatives: specifically, the modifications at the Eisenhower site, and in the "No Action" alternative.

### A. *Eisenhower Proposal*

Plaintiffs allege that the modifications in the proposal for the Eisenhower site were sufficiently large to have warranted the issuance of a supplemental EIS, or at least a more robust FEIS. The government argues that changes made to the Eisenhower Avenue proposal did not create a seriously different picture of the environmental impacts such that a supplemental EIS or new FEIS was necessary. *See* Fed. Def.'s Opp'n. to Pls.' Mot.Summ.J. at 15. The government claims that it:

analyzed the changes made to the Eisenhower Avenue alternative for their effect upon the analyses already performed on the site and properly concluded that the environmental considerations resulting from the changes made to the Eisenhower alternative would result in *de minimus* changes to the characterization of environmental impacts as set forth in the DEIS. The Agency properly decided not to issue a supplemental EIS based on modifications to the Eisenhower Avenue proposal.

*Id.* at 17.

An agency need not issue a supplemental EIS ("SEIS") for all changed scenarios. Rather, an agency must only do so when it makes substantial changes that are relevant to environmental concerns or when there is significant new information bearing on environmental concerns. *See* 40 C.F.R. § 1502.9(c)(1). The Court reviews an agency's determination to issue a SEIS under the "arbitrary and capricious" standard and with deference to that agency's technical determinations. *See Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

 Here, the Court finds that the determination not to issue a SEIS regarding the changes to the Eisenhower site was not arbitrary or capricious. A review of the FEIS indicates that the changes made to the Eisenhower site would not significantly affect environmental impacts regarding the land use plans, visual resources, and parking systems. The Court has determined that a thirty-three foot increase [29] in the proposed office tower on the West Campus, although it exceeds the height limit specified in the Special Use Permit for the complex, did not significantly change the proposal. Just as the government obtained a Special Use Permit for

the original project, the government believes that obtaining an amendment to the Small Area Plan and the Special Use Permit would be both necessary and obtainable. *See* FEIS, at A–14. The Court also reviewed the impact on visual resources by comparing the computer simulations of the proposals and concluded that the visual impact is not significantly changed. *See* DEIS, at 4–69, 4–70, 4–72; FEIS, at A–15 – A–17. Additionally, the proposed reduction in parking spaces is not a significant change from the original proposal. The DEIS estimated that "[i]f visitor and VIP parking spaces are needed to accommodate a peak load demand 10 percent higher than the typical daily employee parking demand, however, each of the three sites has a slight shortfall in the number of spaces needed to accommodate peak demand." DEIS, at 4–95. In the case of the Eisenhower site, the deficit grows from 208 spaces to 308.[30] As a function of typical weekday peak demand, the deficit increased from five percent to about eight percent, which does not present a seriously different picture of the parking resources at the site.

The increased soil excavation at the site does present the possibility of increased environmental impacts with respect to hazardous wastes and, with it, possibly the need for a supplemental EIS. However, the government considered this issue, and determined that the nature of the possible contamination and excavation would not change. *See* Mem. Of P. & A. in Supp. of Fed. Def.'s Mot. For Summ.J. at 25; FEIS at B.1–1, B.9–11, 9–17. Keeping in mind that the agency's decision in this regard involves matters of technical expertise where deference is appropriate, the Court finds that the agency's decision not to issue a supplemental EIS was not arbitrary

---

29. The proposed office tower would be 293 feet high and would exceed the existing 270 feet height limit specified for the site in the Special Use permit for the PTO complex.

30. The original proposal included 3,638 total parking spaces for a typical weekday peak demand of 3,846. The new proposal reduced the parking spaces to 3,538. *See* DEIS, at 4–96.

or capricious.[31]

### B. *"No Action" Alternative*

Plaintiffs also allege that GSA's revision of the "No Action" alternative was a change that should have triggered the issuance of a "full" FEIS, or possibly a SEIS. Given the Court's determination that the format of the existing FEIS is acceptable, and that the government's changed definition of "No Action" is also an acceptable exercise of agency discretion, the question remains whether the issue has received adequate comment and analysis. The Court notes that the modification was itself a response to comments on the DEIS criticizing the absence of any projected development at the Alexandria sites under the "No Action" alternative. There is a substantial discussion of the modification, and resulting impacts, in the FEIS. *See* FEIS at B.3–2 – B.3–5. The Court agrees with the government that "in light of the material contained in the Draft EIS, the comments received on the Draft EIS, and the material contained in the Final EIS addressing these comments" a supplemental EIS is not required. FEIS at B.1–1, 1.2.

### CONCLUSION

The Court is persuaded that the case law supports the government's position with respect to Smith Realty's Alternative Scenario. The government need not consider the Alternative Scenario because it is not a reasonable alternative and will not bring about the government's desired objectives of efficiency. The Court also finds the FEIS submitted by the government has taken the requisite "hard look" at environmental issues associated with the alternative scenarios for the PTO consolidation. Moreover, the Court concludes that it was permissible for the government to define its "No Action" alternative to include rea-

sonably anticipated development unrelated to the proposed PTO consolidation.

Therefore, the plaintiffs' motion for summary judgment is hereby **DENIED** and defendants' and intervenor's motions for summary judgment are **GRANTED** and the complaint is **DISMISSED WITH PREJUDICE.** The Court shall issue an order consistent with this opinion.

### ORDER

Upon consideration of the parties' cross motions for summary judgment, the responses and replies thereto, the arguments in court and the entire record in this case, it is hereby

ORDERED that the motions of the federal defendant [39] and the intervenor-defendant LCOR [27] for summary judgment are hereby GRANTED; and it is further

ORDERED that plaintiffs' consolidated motion for summary judgment and preliminary injunction [28] is hereby DENIED and this case is DISMISSED WITH PREJUDICE.

---

**31.** Intervenor–Defendant LCOR notes that, as a practical matter, any additional information on hazardous waste at the Eisenhower site due to increased excavation could have only made the site *less* attractive and could not have led to its selection as the preferred site. (Int.–Def.Mem. of P. & A. in Supp. of Int.–Def. LCOR's Mot. for Summ.J. at 29)